```
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF KENTUCKY
 2                        LOUISVILLE DIVISION

 3
     UNITED STATES OF AMERICA,    )    Case No. 3:21-CR-00124-DJH
 4                                )
             Plaintiff,           )
 5                                )
     v.                           )
 6                                )
     JONATHON CHASE VOWELS-HARPER, )
 7                                )    December 5, 2024
             Defendant.          )    Louisville, Kentucky
 8

 9                          * * * * *

10                    TRANSCRIPT OF SENTENCING
                   BEFORE HONORABLE DAVID J. HALE
11                  UNITED STATES DISTRICT JUDGE

12                          * * * * *

13   APPEARANCES:

14   For United States:      A. Spencer McKiness
                             U.S. Attorney's Office
15                           717 West Broadway
                             Louisville, KY 40202
16
     For Defendant:          Jonathan S. Ricketts
17                           Ricketts Law Offices, PLLC
                             4055 Shelbyville Road
18                           Louisville, KY 40207

19
     [Defendant present.]
20

21
                        Dena Legg, RDR, CRR, CCR-KY
22                        Official Court Reporter
                          208 U.S. Courthouse
23                        Louisville, KY 40202
                           (502) 625-3778
24
     Proceedings recorded by certified stenographer, transcript
25   produced by computer.
```

1    (Begin proceedings in open court at 11:01 a.m.)

2    DEPUTY CLERK:  3:21-CR-124, United States of America

3    v. Vowels-Harper.

4    MR. MCKINESS:  Good morning, Your Honor.  Spencer

5    McKiness here for the United States.

6    MR. RICKETTS:  Good morning, Your Honor.  Jonathan

7    Ricketts, appointed counsel on behalf of Mr. Vowels-Harper.

8    He's present in custody.  He's approaching the podium.

9    THE COURT:  Good morning.  We are continuing the

10    sentencing hearing which began on September 19.  It was

11    adjourned by agreement on that date in order for the Court to

12    review in camera one of the videos at issue.  The defense

13    objection to the calculations in paragraph 30 of the July 30

14    Presentence Investigation Report added a four-level enhancement

15    to the offense conduct calculation.

16    I will note for the record that a revised PSR was filed at

17    Docket Number 126.  Just so that there's no confusion, one

18    paragraph was added noting the receipt of the victim impact

19    statement; and so that pushed all subsequent paragraphs forward

20    by one.  So in my memorandum and order at Docket Number 127

21    which resolved the defense objection to paragraph 30, I'll just

22    note now for the record that that is now in paragraph 31 of the

23    more recent PSR.

24    We had previously resolved all of the defense objections

25    before adjourning for the Court's in camera review of the video

1     at issue in paragraph 30.  And having now resolved that

2     objection in the memorandum of order, I believe we can now move

3     on to the next topic typically found in sentencing hearings,

4     which is a question of motions.

5         Is that your understanding of the next step in this process,

6     Mr. McKiness?

7               MR. MCKINESS:  Yes, sir.

8               THE COURT:  Mr. Ricketts?

9               MR. RICKETTS:  Yes, Your Honor.

10              THE COURT:  Very well.  Does the Government have any

11    motions to make at this time?

12              MR. MCKINESS:  The United States will move to dismiss

13    Counts 1, 2, and 3 of the Indictment.

14              THE COURT:  Very well.  We will, in the order that

15    follows, dismiss Counts 1, 2, and 3.

16        Any motions to take up now, Mr. Ricketts?  I believe your

17    sentencing memorandum previews one or two such motions.

18              MR. RICKETTS:  Your Honor, we were going to ask the

19    Court to vary from the guideline range, and we had prepared some

20    witnesses for today in support of that.  Specifically, I'm

21    referring to page 5 of my sentencing memorandum.  If the

22    Court -- I assume that's what the Court's alluding to.

23              THE COURT:  No.  I'm alluding to -- I believe you

24    mentioned policy statements -- let's see.  5H, 5K2.10, 5K2.22,

25    did you not mention those as --

1          MR. RICKETTS:  No, I did, Your Honor.  I'm sorry.  I

2     got ahead of myself.  On page 4, we talked about those

3     departures.  I've asked the Court to consider departures based

4     upon 5K2.10 and 5K2.22.

5          It may be beneficial for the Court to hold off on ruling on

6     those until after you've heard the testimony of Dr. Wagner.

7     I'll leave it to the Court's discretion on that.  I think in

8     part the arguments that are made there relate to my client's

9     diagnosis with ASD, Autism Spectrum Disorder.

10          So I understand -- I think I've made it clear in my

11     sentencing memorandum that I understand what the guideline says,

12     and I understand that normally those would not apply, but under

13     the circumstances presented through the psychological report of

14     Dr. Wagner, I believe that they should apply.

15          THE COURT:  Very well.  Then let's have the testimony.

16     And we'll take up -- as we are advised to do, we'll take up

17     motions with respect to departure first before taking up

18     argument regarding the sentencing factors set out by Congress in

19     Title 18 of the U.S. Code, Section 3553(a).

20          MR. RICKETTS:  May I call my first witness?

21          THE COURT:  Yes.

22          MR. RICKETTS:  I had planned to call Dr. Wagner last.

23     And I think I had notified the Court -- if I did not, I

24     apologize -- but I intend to call Mr. Vowels-Harper's mother,

25     father, and then Dr. Wagner.  So if that --

 1          THE COURT:  That's fine, however you wish to proceed.

 2          MR. RICKETTS:  Thank you, Your Honor.

 3     Monika.

 4     (MONIKA LYNN Vowels-Wooden, called by the defense, sworn.)

 5                    DIRECT EXAMINATION

 6  BY MR. RICKETTS:

 7  Q.  Ms. Vowels-Wooden, would you please state your full name for

 8  the record.

 9  A.  Monika Lynn Vowels-Wooden.

10  Q.  And I understand this is an unusual or uncomfortable

11  environment for you.  There is no amplification for the

12  recording device there.  So I'll need you to make sure you speak

13  clearly for the court reporter and make sure you articulate very

14  well.  And if the Court or the United States or I can't hear

15  you, we'll have to ask you to repeat.  Okay?

16  A.  Okay.  I'm gonna try, but I have laryngitis.  And my

17  voice --

18  Q.  Okay.

19  A.  -- may falter a little bit.

20  Q.  Would you need any sort of water or -- you've got that?

21  A.  I've got some, and I've got cough drops.  I will try my

22  best.

23  Q.  Sure.  I apologize for not doing that or not knowing that

24  before you took the stand this morning.

25          THE WITNESS:  I see that.

Vowels Wooden - Direct

1        THE COURT:  Thank you.

2    BY MR. RICKETTS:

3    Q.  Okay.  Ms. Vowels-Wooden, where do you live?

4    A.  In Louisville, Audubon Park --

5    Q.  Okay.

6    A.  -- neighborhood.

7    Q.  And how -- what is your relationship to Mr. Vowels-Harper?

8    A.  I'm his mom and he -- he's lived with me his entire life,

9    but his dad and I coparented.  So he also would go to his dad's,

10   but --

11   Q.  Okay.  Was he living with you at the time of his arrest?

12   A.  Yes.

13   Q.  So it's safe to say, from your testimony, that you've had

14   regular, consistent, continuous contact with your son from

15   birth?

16   A.  Yes.

17   Q.  Has there ever been any long periods of time when he didn't

18   live with you?

19   A.  No, never.

20   Q.  Okay.  You've heard testimony by being in court today that

21   I've identified your son as having ASD or Autism Spectrum

22   Disorder.  Have you heard that before?

23   A.  Of course.

24   Q.  Okay.  And were you with Mr. Vowels-Harper and was he living

25   with you as he was growing up as an adolescent when you started

1   to identify things about him that were different than other

2   children?

3   A.   Yes.

4   Q.   Okay.  Did you immediately know that he was diagnosed with

5   ASD?

6   A.   No, not immediately.

7   Q.   Okay.  How did that come about so to speak?

8   A.   When he was in kindergarten, I remember his teacher coming

9   to me.  And she actually said, "Have you ever had him tested for

10  ADHD?"  You know, autism wasn't as well-known back then.  So I

11  said no.  I didn't have experience with ADHD.

12       So I took him to his pediatrician, and he agreed -- well, I

13  think he agreed not because he saw it in him.  He just -- he

14  asked me a lot of questions.  So he got diagnosed with that

15  first.  So once he started medication -- you can take medication

16  for that.  And he didn't really have the hyper part.  He

17  definitely had attention deficit disorder.  That was obvious

18  and -- excuse me.  And once his symptoms for that got under

19  control, then we really noticed his behavior was -- he was

20  different from his -- well, different.  It was obvious he was

21  different.

22       So when he was in third grade, the school counselor -- I

23  worked with her a lot with, you know, him.  He was in a private

24  school.  And she asked to have an emotional social functioning

25  observation by someone from the Archdiocese.  I don't -- Family

Vowels Wooden - Direct

1   of Ministries or whatever.  It was a Catholic school.  And he
2   came and observed Chase in the classroom, like went about his
3   normal day, and he was just kind of in the background observing.
4       And no one thought of autism at that time, but when you go
5   back and see the report that was written, the signs were there.
6   His functioning -- the way he functioned was there.  He was very
7   immature for his age at eight years old.
8       And then again -- so at some point my sister -- this is
9   after that first observation type report was done.  At some
10  point my sister actually -- she got a book from a yard sale.  It
11  was written by a guy that has a form of autism called Asperger's
12  syndrome.  And she said, "Monika, this reminds me of Chase."
13  And so, you know, I was open for ideas on what -- why he was so
14  different.  So I read the book as well, and I came to that very
15  same conclusion.
16      So at some point I started advocating for him, and I took
17  him to another place because his pediatrician wasn't, like,
18  trained to diagnose that.  And the other place said that he
19  showed symptoms of it, but they didn't diagnose that.  They just
20  kind of suggested some therapy.
21      So when he started high school, he was a freshman.  And the
22  counselor -- he was getting in trouble as a freshman because he
23  was -- he was behaving like a child in high school, like doing
24  dumb things, making noises, blurting out, things that kids would
25  do.  So the counselor came to me, and he -- he's the one that

1    asked to take him to the Louisville Bingham Center by trained

2    psychologists or psychiatrists, whatever you call them, and she

3    finally -- that's -- that was diagnosed.  He was 14 at the time.

4    Q.  Okay.  Now, you mentioned he was different.  Do you have any

5    other children?

6    A.  Yes, I do.

7    Q.  And who is that?

8    A.  He has an older sister who's 12 years older than him --

9    Q.  Okay.

10   A.  -- Krista Vowels, and a brother who's 10 years older than

11   him.  He's here today.

12   Q.  Okay.  And I'll notice -- I notice that she's been at every

13   court appearance, but unfortunately she was unable to -- I'm

14   referring to Jonathon's sister.

15   A.  Right.

16   Q.  She was unable to be here today, but she's been at every

17   court appearance.

18   A.  Yes.

19   Q.  Has she been very supportive of Mr. Vowels-Harper?

20   A.  She always has been.  She's more like a second mom.  You

21   know, she really took on the older sister role.

22   Q.  So I'm not asking you to give me your clinical opinion.

23   You're not a psychologist.  But as his mother, how has -- from

24   what you've seen, how has -- and you mentioned about some

25   behaviors already from high school and those sorts of things,

Vowels Wooden - Direct

1   but what are just some of the things that you've noticed about

2   Chase that are different because of what you believe is

3   attributed to his ASD?

4   A.  Well, the things I notice -- I guess I'll progress to now,

5   but I noticed he was isolated.  He didn't really interact with

6   kids, like, at all.  He would -- and he didn't act like he

7   was -- like it bothered him.  Like, he wasn't trying to make

8   friends, I noticed.  He just was always in his own little world.

9       He was very observing -- or he would observe things, and

10  that was what he would do.  He couldn't talk very good when he

11  was -- probably up till he was -- I couldn't even tell you what

12  age, but he would talk in the beginning, and it was more like a

13  slurring of words.  He had trouble putting his words together.

14  Of course, he's much better now.  He can speak a lot better, but

15  we went through that phase.

16      He also had mannerisms that -- the one -- the two I can

17  think of, he used to have this -- he would just randomly shrug

18  his shoulders like that.  Like, not talking, doing anything, he

19  would do that.  And then he would also have like this smile on

20  his face.  He would just like -- like that, like a -- and I

21  think he was trying to mimic what he would see, not

22  understanding when it's appropriate to smile.

23      As just an example, when he was a baby, he didn't respond

24  to, like, cooing or whatever.  You know, when you cuddle a baby

25  or whatever, he didn't respond like a normal baby.  He didn't

Vowels Wooden - Direct

1    really look at you and smile or anything.

2        And another thing, his -- he had wandering behavior.  There

3    were many times he like -- he would wander off.  So I always had

4    to keep ahold of him, keep my eye on him.  And he -- I couldn't

5    even leave him -- I had to -- he was in childcare all the way

6    through eighth grade.  He was the oldest kid in the after school

7    care program.  And, you know, he never once said, "Mom, I'm too

8    old -- I'm too old to be in this program" because he fit right

9    in.

10       And then when he started high school, I enrolled him in the

11   YMCA summer camps.  There was one near where I worked.  Because

12   he lacks danger awareness and -- sorry, my voice is faltering a

13   little bit.  He lacks danger awareness, and I knew he wasn't --

14   he couldn't stay home while I was working even in high school.

15       By the time he was a junior, I had sold one of -- my house

16   and moved in with my parents while we were looking for another

17   home.  And so my dad was retired, and he lived there.  So he was

18   with my dad.  So that was a comfort.

19   Q.  Is your father here today?

20   A.  He passed away since -- since this happened.

21   Q.  So he passed away since Chase has been incarcerated?

22   A.  Yeah.

23   Q.  Did Chase relate well to older -- much older people?

24   A.  Yes, and -- well, I think so because, you know, the older

25   you are, the more compassionate you are and polite.  And he

Vowels Wooden - Direct

1    would talk about -- I don't know -- facts usually.  And he would

2    talk to adults because they hung around and listened to him.

3    Kids his age, he --

4    Q.  When Chase would engage in conversation with people that you

5    witnessed, would he seem fixated on certain topics?

6    A.   Yes.

7    Q.   And what were those topics --

8    A.   Always.

9    Q.   -- that he was fixated on?

10   A.   He -- he's real big into, like, football/sports statistics.

11   That's his thing or sports in general.  He can name so many

12   players and give you their stats.  He -- he just would become

13   fixated on that, and --

14   Q.   Would he -- did he appear to you, from the other

15   conversations you had with people on those topics, to have sort

16   of an unusual grasp of very minute details about these topics?

17   A.   He would focus on details, like small details about things.

18   He did that his entire life.  He would focus on -- that's what

19   he would talk about.  He would, like, have something on his

20   mind, and that's what he's gonna talk about.  And you can't

21   hardly veer him away from it.  It's --

22   Q.   So if he were -- from your experience, if he were coming

23   into a conversation with someone, or if someone was talking

24   about something, what I'm hearing you say is that Chase would be

25   aware of that conversation and would just talk about what he

Vowels Wooden - Direct

1    wanted to talk about.

2    A.   Yeah.   Since he doesn't understand, like -- or struggles

3    with, like, facial expressions or body language, he totally

4    doesn't -- I don't know why, but he doesn't see -- understand

5    body language and social cues.   So he would just keep on, even

6    if someone -- like, you and I would know, you know, if we start

7    turning away, we're trying to get out of a conversation.   He

8    wouldn't notice that.   And, also, he would invade your personal

9    space.   I don't care 'cause I'm his mom, but he would get really

10   close to people and talk, not understanding that people need

11   their personal space.

12   Q.   You've talked a little bit about this, but at some point in

13   time was Chase able to obtain employment?

14   A.   Yes.   He started working at UPS, but the interview process

15   was online only.   And I guess they do a background check

16   since -- you know, he graduated high school.   He had a clean

17   background.   So he was hired.

18   Q.   And so, obviously, he would leave the home for that reason

19   and would work and then come home.   So there were times when he

20   was interacting with other people, presumably in the work

21   environment; is that correct?

22   A.   Yes.

23   Q.   Were there any particular challenges or events or issues or

24   things that arose that you think occurred to Chase or happened

25   to Chase because -- and I say "Chase."   You refer to him as

1   Chase; correct?

2   A.   His middle name, yes.

3   Q.   Were there any things that occurred to him or happened to

4   him that you think were attributed to his ASD?

5   A.   At work?

6   Q.   Yeah.

7   A.   Yes.  Well -- and I only know this because his super -- he

8   had a very kind -- one of his supervisors was very kind to him.

9   And I would talk to him sometimes, but he told me that Chase was

10  his best employee because it required memorization of ZIP codes

11  or something like that.  He said Chase was very good at that.

12  He was very good at, like, packing the boxes in the trucks

13  for -- he was just very good at it.  But he would talk -- his

14  supervisor told me he would have to steer him from -- he would

15  want to talk and go on about stuff, and his supervisor would,

16  you know, steer him back to work.  But it was like he was

17  babysitting him like a kid.

18  Q.   And that's what the supervisor told you?

19  A.   Yes.

20  Q.   Did you ever become aware that he might have been taken

21  advantage of by anybody at the workplace or somebody that he had

22  met through the workplace?

23  A.   Oh, gosh, yes.

24  Q.   What happened there?

25  A.   Well, Chase, at that time -- he always wanted to be

Vowels Wooden - Direct

1    accepted.  You know, he struggled socially.  And he would try,

2    you know, to make friends.  Well, I'm pretty sure this one

3    guy -- he could see that Chase -- he could see that Chase --

4    it's hard to talk about him when he's sitting right there.

5        I think he saw that Chase was vulnerable, and he would -- he

6    would -- he took a lot of money from him.  He would -- I got to

7    take a drink.

8    Q.  Take your time.

9    A.  This guy got -- he had gotten fired from work, but he was

10   still communicating with Chase.  But he would take money from

11   him, not cash at first.  It was more like, you know, Chase had

12   to pay for all their food if they went to eat.  Chase would --

13   he would have Chase pay for gas a lot of times, and then he

14   started borrowing money.  I can't remember the exact figure, but

15   he took a lot of money from him.  He didn't care at all about

16   Chase.  He was manipulating him.

17       And we all -- his family tried to tell him, you know, "He's

18   not your friend.  He's using you."  And I couldn't understand

19   that because, you know, that guy was so deceitful to him, but he

20   doesn't -- he couldn't understand.  I think he finally did after

21   he was incarcerated, that that guy had no interest in being his

22   friend.  He was just using him.

23   Q.  From your experience with Chase and compared to your other

24   children and just from your experience with other people, do you

25   believe that Chase was more vulnerable than most people or more

Vowels Wooden - Direct

1    -- or that he seemed to be more accepting of things people told

2    him?

3    A.  Very much so.  He -- he trusts so easily.  One reason is he

4    lacks danger awareness.  He doesn't -- he thinks -- he's

5    nonjudgmental when at times you should be.  You should be able

6    to judge people's intentions, but he doesn't know how.  He still

7    to this day does not judge people.  If you talk to him, he feels

8    like you're his friend already.  He's -- and he's easily led

9    astray, easily.

10   Q.  And has that been consistent throughout his life?  I mean

11   more of his adult life.

12   A.  Yeah, yeah.  I was gonna say, when he tried to start making

13   friends later in life than most kids, yes, that was noticeable.

14   Q.  You're aware of the, you know, imprisonment options that the

15   Court has before it today.  We've talked about those at length.

16   A.  Yes.

17   Q.  What are some of your -- especially in light of some of the

18   testimony you've just given, what are some of your concerns or

19   worries about lengthy prison sentences for Chase?

20   A.  First and foremost, I worry immensely about his safety.

21   He's so vulnerable to being picked on or -- that's probably not

22   the right word -- to violence.  He's vulnerable to unspeakable

23   things.

24       I worry that prison guards or whatever won't understand him

25   and take things the wrong way when he says things 'cause he's

Vowels Wooden - Direct

1    just trying to understand.  His brain's wired different, and

2    sometimes he doesn't understand something because you're not

3    being precise about it.  So I worry about, you know, guards

4    disciplining him when all it is is he doesn't understand maybe

5    what they said, if they don't -- if they're not precise, because

6    I was still parenting him up till this happened.  I was still

7    actively parenting him up till this happened.  I worry that now

8    the prison's gonna finish raising him.  I worry about that.

9    Q.  How old was Chase when he was taken into custody?

10   A.  He had just turned 21.

11   Q.  And when you say you were still actively parenting him at

12   the time of this event or at the time he was arrested, what do

13   you specifically mean by that?

14   A.  Because I always worried about his safety and his lack of

15   judgment or impaired judgment about people.  I would keep tabs

16   on him a lot.  Like, I was always calling him.  And I needed to

17   know, "Well, where are you going after work?"  I still gave him

18   guidance on things.  And he to this day -- well, at the time he

19   never said, "Mom, I am old enough to, you know, do this or that

20   or make decisions."  He never said that because in his mind he

21   was still a kid.  And, of course, I still -- he still lived with

22   me and -- sorry.  I'm not finished.  I just worried about him,

23   about his safety.  Excuse me.  Sorry.

24       Wait, one more thing.  Just recently -- and this was very

25   recent.  He talks to his sister a lot, and she told me -- I must

Vowels Wooden - Direct

1    have told him, "No, you shouldn't do that or can't do that."  He

2    asked something -- and this is while he's incarcerated just

3    recently -- and his sister told me that she said -- that he said

4    "Mom is so strict," like he's still a kid and I'm being -- you

5    know, he just said "strict" like a kid still.

6    Q.  What I heard you say is that during his adulthood, while

7    he's been living under your roof, he has never exerted his

8    independence in any way?

9    A.  No, we hadn't gotten to that point.  And I have a feeling,

10   had nothing happened, he would -- he would probably still be at

11   home far longer than most kids because just -- he's so immature

12   for his age.  He was always behind a few -- quite a few years

13   than his peers.

14   Q.  We've talked about the topic of supervised release, which as

15   I explained to you was that period of time, after release from

16   incarceration, the Court can impose upon Chase where he's out of

17   custody but being supervised or monitored by the authority of

18   the Court.  Do you recall that?

19   A.  Vaguely.

20   Q.  Okay.

21   A.  Can you --

22   Q.  Well, we talked about what your plan would be for Chase upon

23   his release.  And I don't remember if you mentioned this

24   specifically in your letter to the Court, but it's my

25   understanding that you informed the Court or that -- and if not,

1   you can inform the Court now -- that you would welcome Chase

2   into your home.

3   A.  Of course.  And --

4   Q.  And would you be able to provide for him any sort of

5   supervision or any sort of reporting requirements and

6   participate in those reporting requirements as the Court may

7   expect of you as a supervisor or somebody whose home he was

8   living in?

9   A.  Yes.

10  Q.  I don't mean to suggest that you'd be doing the supervision.

11  A.  Yeah.

12  Q.  That would be done by the Court.  But the point is that

13  he -- he would have a place to live?

14  A.  Yes.

15  Q.  And, theoretically, would you be willing to provide that

16  place for him to live up until either your death or his death?

17  I mean, it goes that far.

18  A.  Yes, I would.  His sister always jokes, "Mom, Chase is

19  always gonna have to live with you."  But I wanted to say, if he

20  does live with me, I have a feeling I'm gonna have to move to

21  a -- sorry -- to a different neighborhood.  I live in a

22  neighborhood that has its own police force, and it's like a

23  super safe neighborhood.  And if he has that on his record, I

24  have a feeling, you know, we'll be like an outcast or maybe they

25  don't want us there anymore.  That was always our safe place.  I

Vowels Wooden - Direct

1    would have to find somewhere else to live, I think, you know,

2    that has space.  I'm worried about that.

3    Q.  Well, you're worried there's also limitations on people who

4    are registered as sex offenders and those sorts of things.  But

5    what I'm hearing you say is that regardless of what those social

6    or legal limitations might be, you would be willing to

7    accommodate those to care for Chase after his release.

8    A.  Of course.  And if anything ever happened to me, his dad and

9    his sister has expressed -- she's -- in fact, she said, when I

10   pass away -- hopefully I'll live a long life -- she will take

11   over, you know, where -- she'll step in where I departed.

12   Q.  There's quite a few people here in the courtroom today.  Are

13   these all family members of Chase --

14   A.  Yes.

15   Q.  -- or neighbors or loved ones?

16   A.  They're all family.

17   Q.  Yes.  There's a couple people who are absent who have been

18   here at every single court appearance.  Do you know who those

19   people are?

20   A.  Well, of course, his sister.  She couldn't make it today.

21   And his grandma, my mom, since she works -- she's a judicial

22   interpreter.  So when she's -- accepts cases to work, she --

23   it's too hard for her to get someone to cover her 'cause there's

24   a shortage of interpreters she was telling me.  So she wasn't

25   able to be here.  She tried to find a replacement for her, but

1    it was too short of a notice, I guess, and that happens

2    sometimes with her.

3    Q.  So that's his sister and his maternal grandmother, or is

4    that a paternal grandmother?

5    A.   Maternal grandmother --

6    Q.   Maternal grandmother.

7    A.   -- is who I'm talking about.

8    Q.   And that's your mother?

9    A.   Yes.

10   Q.   And were there any aunts or uncles who have been here in the

11   past court appearances but couldn't make it today?

12   A.   I think they're all here.  On his dad's side you mean or my

13   side?

14   Q.  Any side, really.  Any people who have loved and supported

15   Chase throughout this process who just couldn't be here today?

16   A.  My sister couldn't be here today.  She wanted to be.  She --

17   again, it was too short of a notice for her to make

18   arrangements.  She doesn't have the flexibility that I have at

19   work to come in here for every court appearance.

20       And then my brother, he has to find a -- he lives three

21   hours away.  And whenever he takes off work, he has to find a

22   replacement, and he has to put in.  It's like a process.  And he

23   couldn't be here either, and he wanted to be.  But because there

24   was so many false alarm dates, my brother couldn't keep asking

25   off because he couldn't go to work once he asked off because

Chris Harper - Direct

1    they already made arrangements for someone else to take his

2    place, I guess.  I don't know -- understand that system.  It's

3    Ford where he works, but --

4    Q.  Well, the only -- and would you consider all of the people

5    present today and the people who are absent today to be part of

6    the network of people who would be able and willing to support

7    Chase upon his release from incarceration?

8    A.  Yes.  We all love him very much, and we all -- we've all --

9    and I include everybody.  We've always looked after him.  And we

10   always understood that he -- he's always gonna need guidance or

11   looked after for his own safety 'cause, like I said, he lacks

12   that danger awareness.  So yeah.

13          MR. RICKETTS:  Ms. Vowels-Wooden, I don't have any

14   questions for you.  The prosecutor will have an opportunity to

15   ask you some questions at this time.

16          MR. MCKINESS:  I don't have any questions, Your Honor.

17          THE COURT:  Thank you.

18      May your witness step down?

19          MR. RICKETTS:  Yes, Your Honor.  Thank you.

20          THE COURT:  Thank you.

21          THE WITNESS:  Thank you.

22          THE COURT:  You may call your next witness.

23          MR. RICKETTS:  Your Honor, I call Mr. Chris Harper.

24      (CHRIS HARPER, called by the defense, sworn.)

25                    DIRECT EXAMINATION

Chris Harper - Direct

1    BY MR. RICKETTS:

2    Q.   Mr. Harper, would you please state your name for the record.

3    A.   It's Chris Harper.

4    Q.   And what is your relationship to Mr. Jonathon Chase

5    Vowels-Harper?

6    A.   I'm his father.

7    Q.   Okay.  I'm gonna ask just that we kind of not talk over each

8    other, if you don't mind.  I understand you're nervous, and I am

9    too for Chase.  So you're Chase's father; is that correct?

10   A.   Yes.

11   Q.   Okay.  You had the benefit of being in the courtroom and

12   hearing the testimony of Ms. Monika Vowels-Harper; is that --

13   A.   Excuse me?

14   Q.   You were in the courtroom, and you had the benefit of

15   hearing the testimony of Ms. Monika Vowels-Wooden; is that

16   correct?

17   A.   Yes.

18   Q.   Okay.  And you heard her testimony relative to how you

19   came -- or how she came to know that Chase was diagnosed with

20   Autism Spectrum Disorder; is that correct?

21   A.   Yes.

22   Q.   Was there anything that you heard from her testimony about

23   you becoming aware of that that you felt like either was

24   incorrect or that she might have omitted?

25   A.   No.

Chris Harper - Direct

1    Q.   Okay.  So the way she represented that diagnosis unfolding

2    and that it was something that he had essentially from birth is

3    consistent with your experience with Chase?

4    A.   Yes.

5    Q.   And it sounds to me like at certain points in time in his

6    development that he was essentially either misdiagnosed or just

7    not diagnosed with Autism Spectrum Disorder.  Is that true?

8    A.   Yes.

9    Q.   Okay.  But since you've become aware of his diagnosis with

10   Autism Spectrum Disorder, do you believe, as his parent and what

11   you've come to know about that disorder, that that is a fair and

12   accurate diagnosis for him?

13   A.   Yes.

14   Q.   How did -- from your experience with Chase -- and you heard

15   Ms. Vowels-Wooden testify about her regular and consistent

16   contact with Chase and how he lived with her.  I also gathered

17   from her testimony that you were not living under the same roof.

18   A.   No.

19   Q.   Okay.  In spite of that, did you have regular and consistent

20   contact with Chase?

21   A.   Yes.

22   Q.   Okay.  And is that his entire life?

23   A.   Yes.

24   Q.   Okay.  At what point in time did you stop residing in the

25   same residence as Chase?

Chris Harper - Direct

1   A.   We didn't reside together when he was born.

2   Q.   So the time that you spent with him would have been

3   independent from the time that he spent with his mother?

4   A.   Yes.

5   Q.   So she -- how was your time regular and consistent with him

6   throughout his life, if there were like stages of that?  Just

7   kind of generally tell the Court how you would spend time with

8   him over his life.

9   A.   Well, I would keep him on two days during the week, which

10  meant I took him to and from school, and then we alternated

11  weekends.  And then, you know, any time that I had something

12  going on that I wanted him to participate in, she didn't have a

13  problem, you know.  We worked together, you know, to parent him.

14  So there wasn't a whole lot of friction between us on that

15  level.

16  Q.   Were there times where you would take Chase with you to

17  interact with, you know, your peers?

18  A.   Yes.

19  Q.   Okay.  And did you have an opportunity to watch Chase

20  interact and develop over his lifetime?

21  A.   Yes.

22  Q.   Did you ever come to see or notice how Autism Spectrum

23  Disorder affected Chase in his relationship with his peers?

24  A.   Yes.

25  Q.   Could you tell the Court a little bit about what you

Chris Harper - Direct

1    witnessed.

2    A.   Well, we participated in a lot of school functions, ball

3    games.  You know, a lot of times we would go to football games

4    and things and different functions, and Chase would see people

5    that he obviously went to school with and knew.  And when he

6    would see these people, he would try to go up and interact with

7    them, but he was so awkward in his interaction with them that he

8    was largely ignored and just -- you know, they would acknowledge

9    him and -- to a degree and just move on.  And I saw that on a

10   regular basis going to sporting events, you know, that were

11   associated with the school, so -- and that always didn't sit

12   well with me because it bothered me because he just wanted to

13   fit in, you know, and be like every other kid.  And it -- that

14   was definitely a sign that there was problems.

15   Q.   Did you ever think that he was like other kids?

16   A.   Oh, I've known since he was a baby that he was different,

17   there were things that were different.  But, you know, we took

18   him to the pediatrician and they, you know, would do an

19   evaluation on him.  And basically, like his mother said, they

20   kind of steered towards the ADHD, but -- you know, and he was

21   put on different medications; and some of them worked for a

22   period of time, but they would have side effects.  And, you

23   know -- and then when he became a teenager is when he was

24   finally diagnosed at the Bingham Center as being on the

25   spectrum.

Chris Harper - Direct

1    Q.   Would you say that he ever fit in with his peer group?

2    A.   I would say that he didn't fit in and that -- I mean, it --

3    you could see it right away.  I mean, he just -- he was so

4    awkward trying to talk to people and -- you know, in his peer

5    group.  He couldn't judge facial cues, you know, as to when it

6    was his turn to speak or, you know, he would talk to people in a

7    tone that was not yelling, but it was very loud, loudly, and it

8    made him stand out.

9        And so people that were in his peer group, you know, in

10   school, they would kind of isolate him because he was different.

11   And, I mean, it -- it wasn't hard to see, but he did have a

12   couple of people that -- I mean, there were kids that treated

13   him respectfully, you know.  And I would say that's because of

14   how they were raised by their parents and -- you know, but for

15   the most part, they didn't pay attention to him and didn't give

16   him the time of day.  And that's the best way I can describe it.

17   Q.   Did you ever become aware of more extreme interactions with

18   his peer group where he was either ridiculed or made fun of?

19   A.   Oh, yeah.

20   Q.   Was that a regular and consistent thing throughout his

21   school years?

22   A.   Uh-huh, yeah.  And she mentioned, when he started high

23   school, you know, he was acting out, but a lot of that stuff

24   was -- he went to -- he went to high school with -- a lot of the

25   people that he went to middle school with, they went to the same

Chris Harper - Direct

1    high school.  So he would -- there was a handful of them that

2    knew they could put him up to doing things to get laughs.  And

3    he would do them thinking that he was fitting in.  So they're

4    getting a laugh at his expense, and then he's the one that's

5    getting in trouble.  So, I mean, that went on a lot, a lot.

6    Q.  I think you testified to this, but to be sure, I heard you

7    say that Chase did -- he had a few acquaintances who were kind

8    to him or compassionate to him, but otherwise you didn't know

9    Chase to have any friends of his peer group.

10   A.  There was one of my friends that had a son that was a year

11   younger than him, and that was probably his best friend.  And he

12   spent a lot of time with Chase, you know, on the weekends, and

13   they would do things together.  And, you know, that kid's

14   parents have been friends of my family for 40 years.  So, you

15   know, he was in good hands when he was with them.

16       And Chase would always call them like his second parents,

17   and even to this day he calls them.  Even while he's been

18   incarcerated, he calls them and tells them, you know, happy

19   holidays, happy birthdays.  But their son basically treated

20   Chase with respect, and Chase learned how to interact with him.

21   And then there was another kid that he was in high school with

22   that he spent time with and actually would come over and spend

23   the weekend.  But other than that, there was nobody else that I

24   can recall.

25   Q.  It sounds to me like the people that were -- the two that he

Chris Harper - Direct

1    did have sort of friendships with were people who were more

2    aware of his personal situation, people that may have learned

3    from other adults that, "Hey, Chase is different."  Is that

4    fair?

5    A.   Yes.

6    Q.   How did Chase perform academically?

7    A.   Well, through all the struggles and difficulties that he had

8    socially and interacting with his peers, I think that it allowed

9    him to focus more on the academic side.  So he did fairly well

10   in the academic part of school, you know.

11       But it's almost like I would quiz him on stuff, you know, to

12   prepare for tests, and his mind -- he would memorize things, you

13   know, to where when he would take a test, he would just -- it

14   was like he had it in his head.  He would just memorize

15   everything.  He did very well academically.  With all the

16   struggles and difficulties socially and interacting with -- but

17   it was because there was a void there socially.  So I think he

18   kind of focused that void towards the academic side of things.

19   Q.   Is it safe to say that from your experience with Chase that

20   he didn't understand social norms?

21   A.   I'd say that's a good way to put it.

22   Q.   And one example of that you heard Ms. Vowels-Wooden testify

23   to that, you know, he would invade people's personal space, for

24   example, when he's having a conversation.  Did you witness that

25   as well?

Chris Harper - Direct

1    A.   Yes.

2    Q.   But is it safe to say that's not the only characteristic or

3    cue that you witnessed that led you to the conclusion that he

4    doesn't understand social norms?

5    A.   Yes.

6    Q.   And I think you testified to this as it relates to your

7    experience -- or his experience in high school, but by virtue of

8    his ASD, did you find that Chase was more susceptible to being

9    influenced by other people?

10   A.   Chase was very trusting of people.  He didn't have -- there

11   was not a whole lot of processing when it came to trying to earn

12   somebody -- or, you know, build trust with people.  So he was

13   very easily manipulated.  And I think people saw that, and they

14   would take advantage of him in different ways.

15   Q.   Did you -- so throughout his years, he had sort of a -- bear

16   with me for a minute.  He had a linear age, meaning, you know,

17   he was 13 because of his birth year, or 14 or 15, but did you

18   believe that his linear age was consistent with his maturity

19   age?

20   A.   His maturity level was never with his actual age.  It was

21   always lagging behind.  And that's from the time he was walking,

22   you know, to when he was in high school.  He was always behind.

23        And that was another thing that made him stand out as

24   different, you know, because of his maturity level.  You know,

25   he would say things that -- in groups of teenagers, say, that

Chris Harper - Direct

1   were 15, and he would say something that, you know, you would

2   expect a comment from a 10- or 11-year-old, you know.  It's just

3   another way that made things awkward and difficult.

4   Q.  And was that consistent as he got older?

5   A.  Yes.

6   Q.  So, I mean, even when he was 16, he was operating, say, five

7   years behind or six years behind or whatever?

8   A.  Yes.

9   Q.  And was that consistent when he was 21?

10  A.  Yes.

11  Q.  So is that a characteristic or quality that Mr. Vowels-Harper

12  had as long as you knew him?

13  A.  Yes.

14  Q.  Have medications been effective for Chase?

15  A.  Well, in the early years when he was very young and we

16  started taking him to the pediatrician -- 'cause we were in

17  constant communication with school counselors and teachers, you

18  know, and then from our own personal observations of him, they

19  would put him on different medications.

20      And some of them -- you know, I always -- and I think his

21  mom can probably agree with me.  We questioned whether we were

22  doing the right thing by putting him on medication because there

23  were times, like on certain medications, where he would act like

24  a zombie because he was just -- or there were times where he

25  would -- it would make him super tired.  And then there was

Chris Harper - Direct

1    times where he was put on a different medication where he

2    wouldn't eat, and you'd see weight loss, you know.  So there was

3    always a side effect to every one that he took.

4        And then there was some times where, like, he was on some

5    that it seemed like it made him focus too much where like, you

6    know, if you're in a classroom environment and your teacher's

7    going over one subject with you -- well, they're only allotted

8    so much time on each subject.  You have to move to something

9    else.  So it was always a difficult period to get him to stop on

10   this task and move on to another subject, you know, say math and

11   history.

12   Q.  Where are you employed?

13   A.  Excuse me?

14   Q.  Where are you employed?

15   A.  I work at United Parcel Service, and I've been there since

16   June of 1988.

17   Q.  And as part of your employment at UPS -- and that's the same

18   place Chase had worked; correct?

19   A.  Yeah.

20   Q.  As an employee, have you ever had an opportunity to

21   experience people with other disabilities?

22   A.  Yes, I have.

23   Q.  What have been your experiences with them?

24   A.  Well, I'll start by saying I was a shop steward, union

25   steward for many years.  And UPS started a program where they

Chris Harper - Direct

1    employed young adults that had diminished mental capacities and

2    handicaps.  And they would employ them in the jobs where they --

3    basically, it was just labor jobs, say you pull a container off

4    an airplane, and you bring it in.  And they open the door, and

5    they place boxes on a conveyor to put them in the sortation

6    system.

7        And these people were -- they were assigned mentors, and

8    they would kind of oversee getting them to and from work.  And,

9    you know, they would communicate with management on their behalf

10   and different things.

11       Well, there were times where some of them would get -- they

12   would go on break and, you know, they would stay on break too

13   long.  Well, somebody that doesn't have a disability and you

14   take too long on your break, that could be grounds for getting

15   in trouble or termination for stealing time, different things.

16       So there were times where I would get called down to dole

17   out discipline on these kids, and I had a good relationship with

18   the labor manager out there.  And we had a conversation, and we

19   had a representative from the local union there.  And we kind

20   of -- I just brought it up that you can't discipline these kids

21   or hold them to the same standard as you can somebody that

22   doesn't have these disabilities because, I mean, some of these

23   kids couldn't even communicate.  And, you know, you're talking

24   about putting them in a system, you know, starting a progression

25   towards termination.

Chris Harper - Direct

1    So they basically set up stuff with their mentors where we

2  kind of would talk with them.  And the mentors would talk with

3  them, and the parents were brought on board and tried to refocus

4  them and try to make them understand, you know, that they got to

5  do things in a certain manner to not get yourself in a spot or

6  trouble.  So that's what we did.

7    And I think -- and I know this doesn't pertain to that

8  'cause it's a lot different, but I do think that there's a

9  distinction in the way that kids and young adults with handicaps

10 are treated and should be treated, and that's why I brought that

11 up.  And I do think that there is a distinction between a normal

12 kid and the way they're treated and someone that's handicapped.

13 Q.  Is it your belief that Chase is not normal?

14 A.  I don't believe he is.

15 Q.  And do you believe that the ASD has been a handicap for him?

16 A.  Yes, I do.

17 Q.  You've -- have you been able to consistently communicate

18 with Chase since he's incarcerated?

19 A.  Yes.

20 Q.  And does he interact with you as somebody -- as you think

21 somebody might, you know, react or interact who's, you know,

22 looking at such long prison sentences?

23 A.  I don't think that he would be as concerned as someone that

24 -- that someone should be if they did not have Autism Spectrum

25 Disorder.

Chris Harper - Direct

1    Q.  Have you had conversations with him that have led you to

2    believe that he has come to understand the nature of the crime

3    against him?

4    A.  I think he has a grasp of what's going on as far as that

5    goes now, after all the stuff that's went on in the -- you know,

6    being in court.  And, obviously, it's something that makes you

7    aware of the seriousness of what you're here for.

8    Q.  You heard Ms. Vowels-Wooden's testimony relative to some of

9    the fears or challenges that Chase might face if incarcerated.

10   What do you think some of the unique challenges would be for

11   Chase if he were -- had a lengthy prison sentence?

12   A.  Well, first and foremost, I worry about his safety.  And the

13   reason why is because he's very easily manipulated.  He's

14   noticeably different, and people that are incarcerated, that's

15   what they do.  They find chips in somebody's armor and figure

16   out ways to manipulate them or take advantage of them for, you

17   know, whatever gain they can get out of them, and that's

18   something that I worry about with Chase.

19   Q.  Upon release, would you be able to be part of Chase's

20   support system?

21   A.  I certainly would.

22   Q.  And are you willing and able to do that?

23   A.  Yes.

24   Q.  You also heard some of the testimony about living

25   arrangements and some of the social or legal challenges that

Chris Harper - Direct

1    might be presented to you by virtue of a conviction which

2    Mr. Vowels-Harper has.  Would you be able and willing to

3    accommodate those social and legal challenges in your efforts to

4    support and provide for Chase upon release?

5    A.  Yes, yes, I would.

6    Q.  You heard testimony that everybody in the courtroom here

7    today, except for the agent of the Government, is here in

8    support of Chase.  Is that what your understanding is as well

9    from the people here?

10   A.  Yes.

11   Q.  Or at least the gallery.  Are all of them aware of the

12   serious nature of these offenses?

13   A.  Yes.

14   Q.  And they're actually aware of the specific nature of the

15   offenses?

16   A.  Yes.

17          MR. RICKETTS:  That's all the questions I have for

18   you, Mr. Harper.

19          MR. MCKINESS:  No questions, Your Honor.

20          THE COURT:  Thank you.  You may step down.

21       We're going to -- I believe, Mr. Ricketts, at the request of

22   your table, we're going to take a brief break at this point.  We

23   will reassemble in about ten minutes.

24          MR. RICKETTS:  Thank you, Your Honor.

25          (Recess at 12:04 p.m. until 12:18 p.m.)

Wagner - Direct

1          THE COURT:  We're back on the record.  Mr. Ricketts,

2     you have another witness?

3          MR. RICKETTS:  Yes, Your Honor.  I call Dr. Wagner to

4     the stand.

5       (DENNIS WAGNER, PhD, called by the defense, sworn.)

6                      DIRECT EXAMINATION

7     BY MR. RICKETTS:

8     Q.  Dr. Wagner, would you please state your name for the record.

9     A.  My name is Dennis Wagner.

10    Q.  And how are you employed?

11    A.  I have a private practice.  I'm a psychologist.

12    Q.  Okay.  Would you please generally state to the Court your

13    educational background.

14    A.  I have a bachelor's in biology and psychology.  I have a

15    master's in clinical psychology.  I have a doctorate in

16    educational and counseling psychology or educational psychology

17    and counseling.

18    Q.  And do you have any certifications or licensures?

19    A.  I'm licensed with the State of Kentucky as a psychologist,

20    and I am an approved -- I was the first approved sex offender

21    treatment provider and evaluator in Kentucky.

22    Q.  And as part of that, are you credentialed pursuant to KRS

23    532.045 and '050 relative to those services?

24    A.  I didn't hear you.

25    Q.  I said, as part of that certification, are you credentialed

Wagner - Direct

1    pursuant to KRS 532.045 and 532.050?

2    A.   I'm -- I'm not sure what those are.

3    Q.   Those are sex offender treatment statutes.

4    A.   Got you.   Yes.

5    Q.   Have you ever been recognized as an expert in the area of

6    clinical psychology?

7    A.   Yes.

8    Q.   Have you been recognized as an expert in the Western

9    District of Kentucky?

10   A.   Yes.

11   Q.   And have you testified before the Court --

12   A.   Yes.

13   Q.   -- in the Western District as an expert in the area of

14   clinical psychology?

15   A.   Yes.

16   Q.   After your education and your certifications -- or during

17   your certifications, have you been continuously practicing as a

18   licensed psychologist since approximately 1983 or so?

19   A.   Since about 1976 I have.

20   Q.   I apologize.

21   A.   Well, in Kentucky with -- I finished my doctorate in 1987.

22   So after that -- and then I was licensed before then.   I was a

23   certified psychologist with autonomous functioning until I had

24   the doctorate.

25   Q.   I see.   And as part of your practice, have you had a

Wagner - Direct

1    particular focus on sex offender treatment?

2    A.  Yes, most of my career has been in forensics and sex

3    offender treatment specifically since 1987, when they started

4    sex -- they brought sex offender treatment to Kentucky.  And I

5    was the original branch manager and set up the -- I didn't

6    just -- not just me, but I spearheaded setting up the sex

7    offender program -- treatment program in Kentucky, and I did

8    that for a year.

9        I hated administration and the politics around it and moved

10   from that to do what I was trained to do, which was to be a

11   clinician.  So I stayed within the program and continued to do

12   evaluation and treatment and supervised staff and did that until

13   1997.

14       And at that point, they brought risk assessment.  So I was

15   the chief psychologist with the risk assessment unit doing risk

16   assessments of sex offenders across the state and supervising a

17   fleet of psychologists and training other professionals to do

18   evaluations like that.

19   Q.  And along those lines, have you been previously qualified as

20   an expert to testify about defendants convicted of sexual

21   offenses involving minors?

22   A.  I can't hear you.

23   Q.  I said, as part of your experience --

24   A.  Yes.

25   Q.  -- in testifying, have you been previously qualified as an

Wagner - Direct

1    expert to testify about defendants convicted of sexual offenses

2    involving minors?

3    A.   Yes.

4    Q.   Okay.  And as part of your clinical background, have you

5    treated and are you familiar with -- have you treated

6    individuals with Autism Spectrum Disorder, and are you familiar

7    with Autism Spectrum Disorder?

8    A.   Yes.  I've been a psychologist since 1976.  So I've had lots

9    of autistic people across that time.

10   Q.   As patients?

11   A.   As patients.

12   Q.   What is Autism Spectrum Disorder?

13   A.   If I can look at my notes, I can be a little more concise.

14   Autism Spectrum Disorder is a neurodevelopmental disorder that's

15   characterized primarily by problems in -- problems and

16   impairments in reciprocal social interaction and communication

17   and with having restricted and repetitive behaviors, interests,

18   or activities.  The diagnostic manuals break that down further,

19   but I think that that kind of summarizes what it is.

20   Q.   There's a lot to unpack there.

21   A.   Yes, there is.

22   Q.   You testified that it is a neuro -- what was the phrase you

23   used?

24   A.   I said neurodevelopmental disorder.

25   Q.   Neurodevelopmental disorder.  Is there a difference between

Wagner - Direct

1   a psychological disorder and a neurological disorder?

2   A.   Well, specifically, a neurodevelopmental disorder is

3   something that's biological, that's genetic that a person's born

4   with.

5   Q.   So if someone is diagnosed with ASD, is it safe to say that

6   that is a neurological disorder --

7   A.   That's right.

8   Q.   -- that they were born with?

9   A.   They're born with it.

10  Q.   Okay.  You also indicated in your definition that it has

11  social -- I missed the phrase.

12  A.   Reciprocal social interaction and communication impairments.

13  Q.   Reciprocal social interaction impairments.  What does that

14  mean to the layperson?

15  A.   That means that they have trouble understanding -- they have

16  trouble with communication and understanding what people mean

17  when they talk about things.  They have trouble often expressing

18  themselves and saying what they want -- what they want to say.

19  They tend to not grasp concepts quickly.  They tend to not

20  understand cultural norms and what's expected of them in

21  interactions.  They can be really literal in the way they

22  interpret things rather than in understanding implied meanings.

23       They're not good generally with understanding nonverbal

24  cues.  Rather than just verbal communication, they don't

25  understand -- they wouldn't read faces well, or if a person's

Wagner - Direct

1    trying to move away from them or is feeling awkward, they would

2    probably have difficulty reading that.  So they tend to be real

3    literal and concrete.

4    Q.  How do -- and I'm gonna use slang here for a minute and bear

5    with me.  I'm gonna refer to sort of -- there's people without

6    ASD and then, let's say, people with ASD.

7    A.  Uh-huh.

8    Q.  Okay.  How do people without ASD learn social norms?

9    A.  Usually just by interacting with their environment.

10   Sometimes they're trained in it in schools or at home, how to

11   behave in different situations or what's expected in different

12   situations.  And people with autism tend to not pick up on that

13   so quickly.  They don't -- they may understand things literally,

14   but they don't understand innuendo and subtlety in social

15   interaction.

16   Q.  So one of the ways I put it in my mind is I understand

17   social norms in a lot of ways because either I was taught that

18   in school and my brain was receptive to that --

19   A.  That's right.

20   Q.  -- or I've learned social norms through the thousands and

21   thousands of social interactions that I've had my entire life.

22   A.  That's right.

23   Q.  And so someone who -- and when I say thousands and

24   thousands, I mean -- that's just, you know, things like walking

25   into the grocery store or washing, you know, your hands in

Wagner - Direct

1    the -- after you use the restroom or -- all of these things that

2    we learn to do as human beings, based upon the expectations of

3    society, are learned to a vast majority through just our human

4    interaction day-to-day.   Is that fair?

5    A.   That's right.

6    Q.   And that's interaction with other human beings in a social

7    setting?

8    A.   That's right.

9    Q.   What I'm hearing you say is that someone with ASD struggles

10   with that.

11   A.   That's right.

12   Q.   And that's because their brain is different.

13   A.   That's right.

14   Q.   And that's because their brain is different from birth.

15   A.   That's right.

16   Q.   What is empathy?

17   A.   Empathy?

18   Q.   Yes, sir.

19   A.   I have some notes on that.   Empathy is the ability to

20   understand another person's feelings or thoughts, to be able to

21   stand in their shoes.

22   Q.   And do people with ASD show across the board deficits in

23   that area?

24   A.   Yes.

25   Q.   Could you elaborate on that a little bit.

Wagner - Direct

1    A.   In order for a person to feel empathy, they have to

2    recognize how somebody's feeling or was feeling.  They have to

3    be able to put themselves into a -- into the role of the other

4    person.  They would not be good actors.

5        They have to be able to identify -- to have some sense of

6    resonance with the feeling that the other person has and to be

7    able to have a sense for what the other person's experience is

8    and how that impacts them.  And they have to be able to feel

9    those feelings themselves and then know how to respond in a

10   socially appropriate manner.  And people with ASD struggle with

11   that.  That's -- those are difficult things for them to do.

12       Also, kind of related to that, people with ASD tend to feel

13   things more.  They tend to be emotionally more reactive than

14   other people are.  So it's hard to get a clear understanding of

15   how the other person's feeling.

16   Q.   Does ASD affect their knowledge of sexuality?

17   A.   Yes and no.  Not necessarily, but autistic people, research

18   says, tend to have less knowledge and less awareness about

19   sexual issues.

20   Q.   And as it relates to their maturity level, does a person

21   with ASD generally present a certain way relative to what a

22   common person's maturity level might be?

23   A.   Right, they tend to -- they -- they're developmentally

24   delayed.  So they don't have the same level of maturity that

25   most other people would have at that age.

Wagner - Direct

1   Q.  So what I'm hearing you say is that someone who is 21 who

2   has ASD may not present or may not be -- based upon whatever the

3   objective standard for maturity is, would not achieve that at

4   that age necessarily.

5   A.  That's right.

6   Q.  We've heard the phrase ASD being on the spectrum.  Is

7   that --

8   A.  Yes.

9   Q.  Okay.  And what does that necessarily mean?

10  A.  Well, it means that there's a broad range of the way the

11  disorder manifests.  Some people can be -- like, a little less

12  than half of autistic people really don't function well at all,

13  but most can function within society at a reasonable level.

14       There are some that are really incapacitated by it, and

15  there are others -- Ms. Vowels suggested -- talked about

16  Asperger's disorder, which we regarded as kind of a high-

17  functioning autism.  So it's still within the spectrum, but

18  there are degrees of it across it.

19  Q.  And so what I'm hearing you say is that on one end of the

20  spectrum, it could be completely debilitating --

21  A.  Yes.

22  Q.  -- meaning unable to interact or maybe even worse.  But on

23  the other spectrum, you've got somebody who could, you know,

24  appear and interact mostly normal, and then there's everything

25  in between.

Wagner - Direct

1  A.  Yes.

2  Q.  Are males diagnosed -- from your knowledge and research of

3  the literature, are males with ASD at a higher risk of certain

4  criminal offenses more than their counterpart?

5  A.  Yes, yes.  I think three -- three to four times as high as

6  females would be.

7  Q.  In what areas?

8  A.  Usually in terms of sexual awareness, pornography use,

9  inappropriate boundary transgressions, that sort of thing.

10       Females -- for some reason they don't -- what I read,

11  they're not exactly sure why that is other than females tend to

12  be -- what's the word I want to -- inculcated, trained

13  differently, have different cultural expectations than males do.

14  Q.  And what -- from your knowledge, what is it about ASD in

15  males that makes them more vulnerable?  I know you just

16  testified that women might be different because their cultural

17  norms might be inculcated differently than males.

18  A.  Right.

19  Q.  But what is it about a male with ASD that might make him

20  more vulnerable than his -- the nonASD population in making them

21  vulnerable?  What sort of qualities or characteristics do they

22  have?

23  A.  I think that's really -- that's really hard to say.  I think

24  that -- I think that males are expected to be more aggressive.

25  And so they -- they may be more prone to act out aggressively.

1    I think that there's a lot of -- the literature is uncertain
2    about that.
3    Q.  And let's talk a little bit about the uncertain literature.
4    Is it safe to say, from your knowledge and experience, that
5    our -- "our" meaning collectively society's awareness and
6    knowledge about ASD has changed dramatically or significantly in
7    the last, you know, 10, 20 years?
8    A.  Yes.
9    Q.  And why -- why do you think that is?
10   A.  I don't know.  Our just recognizing it's the reality of
11   autism.  And there's much more research now available about it
12   than there has been, but it's still kind of limited.  Part of
13   the problem too is the broad range of the way it manifests.
14   There are, you know, the same characteristics across the
15   spectrum but to different degrees.
16   Q.  I get the impression, after all the research and reading
17   I've done on the topic, that there's really more that we don't
18   know about ASD than what we do know.  Does that sound like a
19   fair statement to you?
20   A.  Yes, that's my understanding too, that there's -- research
21   is conflicted about a lot of the information that's -- so
22   there's a lot that we don't know.
23   Q.  And that the body of research available for ASD is
24   constantly growing, and we're learning more and more every year
25   about how to treat and what some of the symptoms or

Wagner - Direct

1    characteristics are for ASD.

2    A.   That's right.  And there's -- there's an increasing body of

3    literature as it relates to the correctional system or the legal

4    system too.

5    Q.   With regards to -- I want to go back to empathy for a

6    minute.  I may have forgot to ask you something.  Are people

7    with ASD limited in a way in feeling emotions?

8    A.   I didn't understand.

9    Q.   Are people with ASD limited or affected in any way in

10   feeling emotions?

11   A.   Yes.

12   Q.   And what -- explain that, please.

13   A.   Well, they're -- on the one hand, they can be overly

14   emotional and reactive, intense, but in another way they have a

15   hard time understanding their own emotions.  They have a hard

16   time understanding the emotions of others.  There's something

17   called theory of mind that has to do with interoception, their

18   ability to understand their own thought processes and their own

19   emotional responses, and -- as well as other people's and how

20   those things merge.  So emotionally that's a very difficult --

21   they have a difficult time.

22   Q.   And I'm thinking of the situation with a baby, for example,

23   where a toddler or a baby is just now beginning to walk.  And

24   the baby falls, and it's the reaction of the parents that the

25   baby perceives in developing how it reacts to its falling.  Does

Wagner - Direct

1    that make sense?

2    A.  Yes.

3    Q.  And so that's a situation where two people or two -- an

4    individual and another individual are interacting with each

5    other in a social setting, that is developing how one person

6    might react to a certain situation; correct?

7    A.  That's right.

8    Q.  And what I'm hearing you say is that people with ASD are

9    limited in that way because they may not be able to perceive and

10   understand how that person is reacting to them.

11   A.  That's right.

12   Q.  And in the area of sexual settings or sexual norms, does

13   that affect their understanding of sexual norms?

14   A.  Of course it does.

15   Q.  So, for example, if an individual with ASD would

16   inappropriately touch another person, that person -- again,

17   talking about as a child and developing these thousands and

18   thousands of interactions -- touch them somewhere for whatever

19   reason and that person reacts a certain way, for a normal

20   person, somebody without ASD, that might inculcate in that

21   person an understanding that what that person just did was

22   inappropriate.

23   A.  Yes.

24   Q.  But that sort of interaction would fall deaf on an

25   individual with ASD because they could not appreciate that

Wagner - Direct

1    reaction?

2    A.   It's more likely too, yeah.  They -- yes.

3    Q.   Also, from your knowledge and experience, have you learned

4    whether or not people with ASD tend to be more isolated or

5    depressed?

6    A.   Yes, they are.

7    Q.   Why is that?

8    A.   That is because they -- it's hard for them to develop

9    relationships, to develop friendships, to fit in.  They tend to

10   be the object of bullying.  They tend to be ostracized in social

11   settings.  So they don't -- they don't have kind of ongoing

12   relationships with people as a rule, not stable relationships.

13   And so they find themselves isolated, lonely, depressed.

14   Q.   And you talked about their tendency to be literal.

15   A.   Yes.

16   Q.   In the context of males with ASD being more susceptible to

17   sexual crimes than women, does their quality or characteristic

18   of being more literal play into that, from your knowledge?

19   A.   I'm not hearing you.

20   Q.   Does the quality of an ASD individual or the characteristic

21   of an ASD individual being more literal --

22   A.   Oh, yes.

23   Q.   -- play into their vulnerability or their higher

24   susceptibility for sexual crimes?

25   A.   Yes, black and white, yeah, concrete.

Wagner - Direct

1    Q.  Let's talk a little bit about Chase.  We're gonna turn from

2    that conversation and talk about Chase.  As part of the work

3    that you did for Mr. Vowels-Harper, did you have an opportunity

4    to review extensive medical history?

5    A.  Yes.

6    Q.  And did you have an opportunity to perform testing on

7    Mr. Vowels-Harper?

8    A.  Yes.

9    Q.  Did you have the opportunity to employ the services of

10   another psychologist in performing testing on Mr. Vowels-Harper?

11   A.  Yes, I did.

12   Q.  And did you have -- I've done work with you before, and I

13   know you've presented reports before, but I get the impression

14   from the report that you issued in this case that you had a lot

15   more data available to you in reaching some conclusions and

16   opinions for this gentleman than you might have -- that might be

17   available to you for other defendants you've testified for in

18   the past.

19   A.  Yes.  He has a long history of documented mental health

20   involvement.

21   Q.  And in part to his -- to contribute to your work, you also

22   had the opportunity to work with his parents in obtaining all

23   the medical records that they had -- were able to achieve or

24   gather throughout his life.

25   A.  That's right.

Wagner - Direct

1    Q.  Did you have an opportunity to review school records?

2    A.  Yes.

3    Q.  Did you have an opportunity to review notes and assessments

4    from other professionals that had treated or seen

5    Mr. Vowels-Harper throughout his life?

6    A.  Yes, I did.

7    Q.  Did you have an opportunity to review testing scores, like

8    things that he would take in school, the ACT and --

9    A.  Yes.

10   Q.  Okay.  Did you have an opportunity to look at some of his

11   testing scores when he took classes at JCTC?

12   A.  Yes.

13   Q.  Did you have an opportunity to review detention center

14   records while he was detained pending this case?

15   A.  Yes, some.

16   Q.  Do you believe that you had an adequate -- or an opportunity

17   to adequately review all the records that were made available to

18   you?

19   A.  Yes.

20   Q.  And do you believe that you had -- I'm sorry?

21   A.  It was a thick file.

22   Q.  And do you believe that you had enough documentation

23   available to you as a clinician in order to reach conclusions

24   that you feel confident in relative to Mr. Vowels-Harper?

25   A.  Yes.

Wagner - Direct

1   Q.  Based upon all the documentation that you reviewed and the

2   testing that was performed before and after you were appointed

3   in this case and your work with Dr. Edelson, who did additional

4   testing for you in this case, do you believe that

5   Mr. Vowels-Harper has Autism Spectrum Disorder?

6   A.  Yes.

7   Q.  Is there really any question in your mind?

8   A.  No.

9   Q.  What are the cognitive signs for autism that you've

10  perceived specifically for Mr. Vowels-Harper?

11  A.  There's a whole section in the report that addresses that.

12  Do you know what page that's on?

13  Q.  I'll have to take a look.

14  A.  It's on page 12.  Regarding cognitive signs of autism,

15  Mr. Vowels-Harper said he functions best with routine and

16  consistency.  He feels structure is real important.  He feels

17  safest and most comfortable when he knows what to expect.

18  Thinking in absolutes comes naturally to him.  That's that

19  black-and-white thinking.

20      He cares deeply and is extremely knowledgeable about a few

21  specific areas of interest.  He tends -- he was very into cars

22  and sports and very detail-oriented.  They tend to get tied up

23  in details and miss the big picture.  When he works on something

24  he enjoys, he easily becomes absorbed in that activity.  He's

25  exceptionally passionate about his hobbies and interests and

Wagner - Direct

1   knows more about his interests than most of the people he knows.

2       Sudden changes in plans really bother him, and he finds it

3   usually difficult to change his mind.  Sometimes he's very

4   persistent and goal-oriented when it comes to things he cares

5   deeply about.

6       And sometimes puzzles are fun and even soothing to him.  You

7   know, it's that -- it's the focus.  He's good at noticing

8   details, but he said imagine -- his mother said imagination,

9   anything abstract is challenging.

10  Q.  Relative to some emotional signs, does Chase present with

11  some of the same emotional signs that other people with ASD

12  present?

13  A.  Yes.

14  Q.  Does he have trouble understanding innuendo or difficulty

15  understanding social norms?

16  A.  Yes.

17  Q.  Emotionally -- would you say that maturity is a function of

18  someone's emotional abilities or their cognitive abilities, or

19  is that just a bad question?

20  A.  Both.

21  Q.  Both?

22  A.  It's both.

23  Q.  Okay.  And from a maturity standpoint from your work with

24  Mr. Vowels-Harper, is Mr. Vowels-Harper immature for his age?

25  A.  Yes.

Wagner - Direct

1    Q.  All right.  And are you confident in saying that that is a

2    function of his ASD?

3    A.  Yes.

4    Q.  So, I mean, some people can be immature, of course, because

5    they were raised that way or they have an overprotective parent

6    or something along those lines, their ability to understand and

7    to function as somebody of their age ought to function.  What

8    I'm hearing you say is that Mr. Vowels-Harper is not functioning

9    at the age that he should be functioning at because of his ASD.

10   A.  That's right.

11   Q.  And when I say "function," I'm referring to his maturity,

12   meaning how someone of his age should operate.

13   A.  That's right.

14   Q.  Now, I want to talk about this idea of disability.

15   Disability does not necessarily correlate with a disorder.

16   A.  That's right.

17   Q.  And what I'm saying there is that you could have a disorder

18   but not have a disability.

19   A.  That's right.

20   Q.  And why is that?

21   A.  Well, disability refers to a person's ability to manage

22   their own lives, to adapt to their environment, to work in a job

23   situation.  Can they -- to what degree are they limited?

24   Q.  And that's like ASD might be -- the concept of disability

25   might best be explained on a spectrum?

Wagner - Direct

1    A.   That's right.

2    Q.   So just because Mr. Vowels-Harper went to UPS and had a job

3    for a period of time in your mind does not diminish your opinion

4    that he has ASD, that he has a -- that he has a disorder.

5    A.   That's right, yeah.  He probably functioned well there

6    because of the structure of the job situation.

7    Q.   You mentioned in your report that Chase had uneven skill

8    levels.

9    A.   Yes.

10   Q.   Do you recall that?

11   A.   Uh-huh.

12   Q.   What did you mean by that?

13   A.   I was kind of limited in the intellectual assessment that I

14   could do because we were -- we were through a glass at the jail.

15   So I couldn't do everything that I might have done, but the

16   parts of the evaluation that I did were verbal abilities and

17   memory abilities, if I can find that.

18       Let's see.  He was real strong in the superior range.  I

19   mean, there's average, above average, superior.  He was real

20   superior in calculation skills, problem-solving skills, like

21   mathematical things, mental manipulation of number operations,

22   real strong, but he demonstrated -- relative to his other

23   abilities, he was weak in his ability to express abstract social

24   conventions, rules, expressions, the very thing we're talking

25   about with autism getting into social -- understanding of social

Wagner - Direct

1    norms.

2    Q.   Does Mr. Vowels-Harper's diagnosis of ASD affect his

3    perception of the world or how he is perceived by others?

4    A.   Yes, of course.

5    Q.   In what way does it affect his perceptions of the world?

6    A.   I think that my experience with -- well, him specifically, I

7    think that he, like many people with autism, tend to be very

8    shortsighted; and so they don't see the big picture.  They get

9    tied up with kind of immediate interactions and not so much with

10   the world at large.  Am I answering your question?

11   Q.   Yes.  And then how would -- how would it -- from your -- and

12   I'm talking about specifically.  You talked generally about how

13   people with ASD can be perceived by others.

14   A.   Yes.

15   Q.   But from your interaction with Chase, what was your

16   perception of how others perceive him?

17   A.   That's hard to say.  Just thinking back on the records that

18   I reviewed, the mental health records and what his parents had

19   said, people see him as nice.  He's a kind fellow.  He's a --

20   but doesn't always know how to respond in situations, can be

21   pretty inappropriate in situations.  And people might see him as

22   kind of goofy sometimes, and that sets him up for the bullying

23   often.

24   Q.   Do you think that he reads people well or he's limited?

25   A.   That's kind of a relative question.  Does he have difficulty

Wagner - Direct

1    reading people?  Yes.

2    Q.   Is he limited in the way he can read people by virtue of his

3    ASD?

4    A.   Yes, he's limited.

5    Q.   Other than ASD, do you think that Chase has any other

6    diagnoses?

7    A.   Well, he has a long-standing history of ADHD, attention

8    deficit disorder.

9    Q.   Anything else in your mind that might contribute in the

10   Court's mind to his participation in a crime like he has pled

11   guilty to today?  Any other mental problems?

12   A.   Specifically related to his case?

13   Q.   Yes.

14   A.   I think that he tends to be -- I think that he tends to be a

15   follower.  I think that as many people with autism are,

16   they're -- they tend to trust people and -- or not, but they

17   will tend to do what's expected of them or think what's expected

18   of them.  So I think that enters in.

19   Q.   So by following, I put that in the mind of kind of somebody

20   who wants to please other people.

21   A.   Yes.

22   Q.   Is that fair?

23   A.   Yes.

24   Q.   So if someone asked me -- if someone asked Chase to do

25   something, his assessment of the situation because of his ASD

Wagner - Direct

1    isn't necessarily whether or not it's right or wrong.  It's a

2    matter of whether or not -- in some ways that he wants to please

3    that person.

4    A.   That's right, living up to what he thinks is expected.

5    Dr. Edelson emphasized that point in his evaluation.

6    Q.   And based upon your testing and the data that resulted from

7    the testing of Chase, did you conclude that he had significant

8    limitations in his adaptive skills?  Based upon your testing --

9    can you hear me okay?

10   A.   Yes, I can.

11   Q.   Based upon your testing, did you determine from those

12   results that Chase had significant limitations in his adaptive

13   skills, such as communication, self-care, and self-direction?

14   A.   Yes, yes, extremely low.  Those scores were based on ratings

15   by his parents.  His father rated him a little higher than his

16   mother, but both parents independently saw him as having a lot

17   of difficulty with independent adaptive functioning.

18   Q.   Did anything that they reported to you from their subjective

19   experiences appear to be inconsistent with the other data you

20   reviewed that you testified to?

21   A.   No, no.

22   Q.   Did the struggles that he has from an adaptive perspective

23   in the area of communication, self-care, and self-direction, did

24   those all manifest themselves before his 18th birthday?

25   A.   Yes.

Wagner - Direct

1   Q.  And do you believe that these limitations impact Chase's

2   ability to appreciate social -- and understand social norms?

3   A.  Yes.

4   Q.  Is it fair to say, from your investigation and research,

5   that the limitations that Mr. Vowels-Harper have regarding his

6   social understanding is below that of his peers?

7   A.  Yes.

8   Q.  Is there any test that you're aware of that will determine

9   Mr. Vowels-Harper's social age when compared to peers based on

10  his diagnosis of ASD?

11  A.  Not that -- not that I have available, not that I could come

12  up with.  You're talking about a social age?

13  Q.  Yes, sir.

14  A.  No, I don't know.

15  Q.  So if I said -- you know, if the Court said, "Dr. Wagner, I

16  want you to go do a test and tell me how old Mr. Vowels-Harper

17  is socially" --

18  A.  Yes, no, I don't know.  I don't know of an instrument that

19  can do that.

20  Q.  Okay.  But based upon your research and your investigation

21  and your testing with Mr. Vowels-Harper, do you believe that he

22  is below, from a maturity standpoint, the age of his -- his

23  linear age?

24  A.  That's right.

25  Q.  Does this prevent Mr. Vowels-Harper from understanding or

Wagner - Direct

1    distinguishing between right and wrong?  That's a broad

2    question.  I'm talking about social -- socially.

3    A.  Yes.

4    Q.  So to restate the question, does ASD prevent

5    Mr. Vowels-Harper -- from what you've studied about him, prevent

6    him from understanding what's right or wrong in social settings?

7    A.  Yes.

8    Q.  And this is -- I'm looking for kind of a -- more of a

9    scientific explanation here, but does ASD affect how

10   Mr. Vowels-Harper understands between right and wrong?

11   A.  Well, yes.

12   Q.  Could you explain that, please.

13   A.  It's hard for him to understand kind of the reality of

14   situations.  His perceptions tend to be distorted or limited,

15   shortsighted, as I said.  He -- it's hard for him to judge how

16   other people are responding to him and how they're -- how

17   they're perceiving his interaction with him.  Sometime -- and he

18   may try to meet them where they are, but really it's kind of

19   himself.  I remember him talking about that, that he was kind of

20   trying to present a part of himself that would be acceptable,

21   but that it's awkward.

22   Q.  Are there certain things about his characteristics or about

23   his personality, I should say, certain things about his

24   personality which are off-balance, so to speak, in the way he

25   interacts with other people?  And where I'm going with that,

Wagner - Direct

1    just to be clear, is you talked about his willingness and desire

2    to please other people.

3    A.   Yes.

4    Q.   And that's a function of his ASD; correct?

5    A.   Yes.

6    Q.   And because of that is he more likely to behave in a way

7    that would be socially unacceptable because -- not because he

8    appreciates the social norm and disregards it but because he's

9    more interested in pleasing the other person?

10   A.   I think in his case, yes, that's true.

11   Q.   And that also plays into the conclusions, of course, that

12   you found that he's very shortsighted.

13   A.   Yes.

14   Q.   Your work with Mr. Vowels-Harper wasn't just, you know,

15   clinical.  I think you also did a lot of work understanding his

16   personal history, meaning -- and that might fall under the

17   clinical umbrella, but I understand that you had an opportunity

18   to interview him about his personal history.  You extensively

19   interviewed family members by virtue of questionnaires that they

20   submitted to you that you were able to prepare.

21   A.   Interviews, right.

22   Q.   Interviews.  And you were able to understand a little bit

23   more about his dating history.

24   A.   Yes.

25   Q.   Is that correct?  Did you discuss with him anything about

1    his dating history?

2    A.   Yes.

3    Q.   Okay.  And based upon his dating history, were you able --

4    was his dating history data, or the information you concluded

5    from that, consistent with the testing data which suggested that

6    he was a follower and not an initiator in those relationships?

7    A.   Yes.

8    Q.   Okay.  So just to bring that back to home, from your

9    experience with the testing and with the interviews of family

10   and the social history and everything you've learned about

11   Mr. Vowels-Harper, is it safe to say that Mr. Vowels-Harper was

12   not the initiator in his dating relationships?

13   A.   I think -- and I don't know about every one, but that seemed

14   to be the trend, that, you know, he wouldn't know how to

15   interact, but women tended to come on to him more rather than

16   vice versa.

17   Q.   Did you ever -- were you able to determine whether or not

18   Mr. Vowels-Harper had any sort of aggressive tendencies?

19   A.   No, and there was nothing that showed up in his -- in his

20   testing or history that I can recollect that would make me

21   describe him as aggressive.

22   Q.   Now, you're very much aware of the charges that

23   Mr. Vowels-Harper pled guilty to.

24   A.   Yes.

25   Q.   And you're aware of the events that led up to that?

Wagner - Direct

1    A.   Yes.

2    Q.   You were given access to data that I was able to have access

3    to by virtue of the discovery process.  So you're aware of

4    police reports and the facts and circumstances that led up to

5    his arrest.

6    A.   I have limited information, but I have certainly his version

7    of what happened, and I have reports of what was -- was to have

8    happened.

9    Q.   And you've talked to Mr. Vowels-Harper -- or you've talked

10   about Mr. Vowels-Harper's limitations and his adaptive skills,

11   such as communication, self-care, and self-direction.  We've

12   talked about those, and we've talked about how those are the

13   result of his ASD.

14   A.   Yes.

15   Q.   Did any of these limitations, in your opinion, play or could

16   have contributed to his role in the commission of the crime that

17   he's pled guilty to?

18   A.   Well, certainly in communication, that's the biggest issue

19   and being able to -- or to understand what the other person is

20   trying to communicate to him.  And perception -- I mean, the

21   social perceptions were the weakest areas.

22   Q.   And in the area of self-direction, I've heard you testify

23   that he would have been weak in that area and more prone to be a

24   follower.

25   A.   That's right.

Wagner - Direct

1    Q.  Do you think that had -- that quality from his ASD had

2    anything to do with his involvement in this case?

3    A.  Yes, I do.

4    Q.  Based upon all these limitations that you've testified to

5    that Mr. Vowels-Harper have and that you have put in your

6    report, did you -- can you qualify or characterize

7    Mr. Vowels-Harper as a predator?

8    A.  I would not regard him as a predator.

9    Q.  Why not?

10   A.  I don't see it in his history.  I didn't hear it in his

11   report of what was -- of his perceptions of what was going on

12   and his interactions with the girl.  So, no, I don't have any

13   reason to see him as a predator.

14   Q.  Do you think, from your review of the matter, that

15   Mr. Vowels-Harper ever saw himself as taking advantage of a

16   minor?

17   A.  No, no, I don't think -- I don't think so.  I think, in

18   fact, by his report, he was trying to backpedal and didn't want

19   the conversation with her to continue.

20   Q.  Does the way that the minor presented to him visually affect

21   his understanding of the situation?

22   A.  Yes.

23   Q.  Could you explain that, please.

24   A.  Well, he said she was -- she was a "big girl."  And so she

25   presented with what he saw to be breasts and talked about pubic

Wagner - Direct

1    hair.  So he saw her as older than -- or, you know, at least as

2    a teenager, but he didn't see her as a young child.

3    Q.  And as far as he reported and what the evidence showed

4    relative to her statements about her own experience, would that

5    have -- to Mr. Vowels-Harper, would that have played into his

6    understanding?  You talked about literal, him being literal.

7    A.  Yes.

8    Q.  Would that have played into his understanding of the

9    scenario?

10   A.  Yes.

11   Q.  You had an opportunity to review the presentence report in

12   this case.

13   A.  I did, but I don't remember.  I got that after this report

14   was finished.  And so I didn't include it, and I don't remember

15   it, no.

16   Q.  Right.  But you understand -- we shared that with you.  You

17   had an opportunity to review some of the chat history between

18   the minor victim in this case and Mr. Vowels-Harper as it was

19   reported?

20   A.  I'm not hearing you.  I'm sorry.

21   Q.  In the presentence report -- the presentence report included

22   some of the chat history --

23   A.  Yes.

24   Q.  -- between Mr. Vowels-Harper and the minor victim in this

25   case.

Wagner - Direct

1    A.   Yes.

2    Q.   Okay.  And after you had an opportunity to review that chat

3    history, did that change anything that you put in your report?

4    A.   No, no, that was -- what I recall is that that was -- it was

5    kind of a section of the interaction, but it didn't -- I didn't

6    know how it began, you know.  So where did this conversation

7    start from and how did it get to this point?  That was my

8    reaction at that time.

9    Q.   But there wasn't anything in that -- what I'm getting at is

10   there wasn't anything in the PSR with regards to the chat

11   between those two that led you to believe that anything in your

12   report was inaccurate?

13   A.   No.

14   Q.   We talked about the inability to appreciate social norms,

15   which is a hallmark characteristic of people with ASD.  Does

16   that affect the things that they say?  What I'm saying is

17   Mr. Vowels-Harper in the chat history --

18   A.   Yes.

19   Q.   -- said some things which neither you or I would say.

20   A.   Right.

21   Q.   Right.  Because they're socially inappropriate.

22   A.   Right.

23   Q.   So do you believe that Mr. Vowels-Harper's diagnosis with

24   ASD affects or affected in this case some of the things that he

25   said?

Wagner - Direct

1    A.   Of course.

2    Q.   And is that because he does not appreciate -- by virtue of

3    his defect that he's had at birth affects his ability to

4    appreciate and understand those things?

5    A.   That's right.

6    Q.   So he can hear other people say those words, thinking that

7    they might be appropriate to use, but not understand that they

8    are inappropriate to use?

9    A.   That's right, yeah, exactly.

10   Q.   And one of the reasons why he would never know that those

11   were inappropriate to use is because he doesn't pick up on the

12   social cues that are associated with the use of those words in

13   normal social settings.

14   A.   That's right.

15   Q.   So if someone were to read those chats without knowing that

16   the person who was speaking had ASD, a reasonable conclusion

17   from somebody might be that there's some sort of sexual

18   deviance --

19   A.   Yes.

20   Q.   -- associated with those statements.

21   A.   Yes.

22   Q.   But would that assumption be correct in this case knowing

23   that Mr. Vowels-Harper has ASD?

24   A.   No, it's out of context.

25   Q.   Out of context because he has ASD and the --

Wagner - Direct

1    A.   That's right, that's right.  It has to be understood within

2    the framework of the disorder.

3    Q.   You said he was not a predator, but based upon your

4    evaluation, would you say that -- or classify Mr. Vowels-Harper

5    as a pedophile?

6    A.   No.

7    Q.   Have you had experience in classifying people as pedophiles?

8    A.   Many.

9    Q.   Many.  Hundreds?

10   A.   Yeah, yeah, I -- I've worked with the sex offender

11   population for 30 years.

12   Q.   I'm sorry?

13   A.   For 30 years I've worked with --

14   Q.   I'm just glad I got a chance to say I didn't hear you this

15   time, so -- and based upon your experience, which is -- you had

16   a lot of experience in the area of sexual offenders.  You feel

17   confident in saying that Mr. Vowels-Harper is not a pedophile?

18   A.   That's right.

19   Q.   Are there things about pedophilia that you're aware of that

20   exclude him from that classification?

21   A.   Pedophilia by definition is an enduring sexual attraction to

22   prepubescent children.  His perception of the girl was that she

23   was at least into puberty or beyond.  He said he thought she was

24   16 or 17.  So he did not see her as a child.  And there's

25   nothing in his history that I'm aware of that would indicate an

Wagner - Direct

1    attraction to children.

2    Q.   Is he prone to violence?

3    A.   No.

4    Q.   Did he express any attitudes to you that would condone

5    sexual violence?

6    A.   No.

7    Q.   Did you see anywhere in Mr. Vowels-Harper's treatment

8    history or clinical history where he received the therapy that

9    was necessary for someone with ASD?

10        And let me be -- there's a -- we've -- in the report, I read

11   somewhere that he received some individual therapy or something

12   along those lines, but I also understand that some of the

13   therapy that he received was not specifically tailored to

14   somebody of his needs.

15   A.   That's right, especially the earlier therapies.  They were

16   more around social skills, more about how to interact with --

17   with other people in the group.  And he was -- he was described

18   as, you know, being pretty tangential in his interactions with

19   the group members.  But when he finished, there was an

20   improvement in social skills.  It was later in the therapy --

21   when is in the report -- when he finally came to understand that

22   he has autism or a developmental disorder and how that might

23   show up.  He seemed unaware of it before.

24   Q.   Do you believe that it's possible for Mr. Vowels-Harper to

25   obtain treatment or therapy to prevent something like this

Wagner - Direct

1   happening again?

2   A.   Yes.

3   Q.   "This" meaning this particular case, this criminal conduct?

4   A.   Yes.

5   Q.   And what is that type of treatment?

6   A.   Well, I think that -- I think that the treatment would have

7   to be with a therapist who is familiar with issues of autism,

8   and it has to be somebody who's familiar with issues of sex or

9   sexual offending, sexual acting out.  I also think that it

10  should be individual therapy rather than group therapy because

11  that would tend to be confusing to him.

12  Q.   And I think this -- you answered my question, but if I asked

13  you what type of special considerations would need to be

14  accounted for when seeking therapy, I think you've kind of

15  testified to that.  It would have to be somebody who's --

16  A.   Yes.

17  Q.   -- qualified in the area of ASD to give that type of

18  therapy.  It also -- it should be in an individual setting.

19  A.   That's right.

20  Q.   Did you find -- I think you testified to this, but did you

21  find that the previous therapy that Mr. Vowels-Harper had was

22  inadequate because it was a group therapy setting?

23  A.   Well, yeah, I think that -- I think that at the time, with

24  what the therapist saw going on, they addressed the issues, but

25  there's more that needs to be addressed that was not addressed.

Wagner - Direct

1    Q.  Did Mr. Vowels-Harper express to you a willingness to take

2    responsibility for his behavior?

3    A.  Yes.

4    Q.  Could you explain that a little bit.

5    A.  Well, he knows that what he -- what he did was wrong.  He's

6    never -- he's never made any excuses for it.  I think that even

7    the last time I talked with him, there was still -- still a

8    sense of thinking that the girl had given him permission to keep

9    moving forward in this conversation, but -- he recognizes the

10   difference in age now, but he did not at the time.

11   Q.  And do you believe that his -- what you just testified to,

12   the fact -- I'm gonna call that a hang-up, so to speak.  He's

13   hung up on this piece of it.

14   A.  All right.

15   Q.  Do you think that is sort of a classic or hallmark function

16   of the ASD?

17   A.  I think that is the result of the ASD.

18   Q.  Did Mr. Vowels-Harper do anything throughout his life that

19   would have made his ASD any worse than it is?

20   A.  No, no.

21   Q.  I mean, this is -- again, I want to go back to this.  This

22   is something he's had from birth.  It's been consistent

23   throughout his life.  And he didn't, like, you know, use drugs

24   or do anything that, like, made it worse than it is?

25   A.  No, no.  That would have worsened the ASD.  No.

Wagner - Direct

1    Q.   From your experience with the ASD population and with sex

2    offenders, how appropriate do you believe -- just as far as

3    rehabilitation and as far as the things that are available to

4    him while incarcerated, how appropriate do you think

5    incarceration is for him?

6    A.   I think that would be very inappropriate.  I think that it

7    would be -- it would put him in a pretty precarious situation;

8    and that's also addressed in the report.

9        The prison environment would -- he has sensory issues where

10   he's sensitive to noises and tastes and a lot of -- mostly

11   noises and tastes and smells, and the prison environment would

12   just be rife with things that would be irritants to him.

13       He also does not read -- and the biggest thing, I think, is

14   he doesn't read situations well.  And so he's gonna be

15   surrounded by inmates, some of whom would take advantage of him.

16   He stands a very good chance of being victimized in there.

17       You know, I also don't know that the correctional staff -- I

18   worked in prisons for many years.  I don't know that the

19   correctional staff are historically trained in dealing with

20   autism and sensitivity to it.

21   Q.   Would his ASD dis -- and the sensitivities that you talk

22   about disproportionately affect him than, say, an inmate without

23   ASD?

24   A.   Yes.

25   Q.   If he were to be incarcerated, in your opinion, how

Wagner - Direct

1    important would it be -- or would it be important for him to

2    have or go to a facility that is able to accommodate someone

3    with ASD, whose staff is trained in that area?  Some sort of

4    special needs facility that would be able to accommodate that,

5    would that be important?

6    A.  I think that would be very important.

7    Q.  And would that be not only from the humanitarian

8    perspective -- right? -- of putting somebody who has these

9    heightened sensitivities that could disproportionately affect

10   him -- so it would mitigate that sort of additional trauma that

11   would be in addition to what maybe an average inmate would

12   experience, but would that also be from the standpoint of the

13   rehabilitative aspect of incarceration, if there is any?

14   A.  Of course, yeah.  If he's gonna -- the foundational stuff

15   has to be there in order for treatment to be effective.  So he

16   has to be in a safe environment.

17   Q.  Going back to ASD in general but also specifically to

18   Mr. Vowels-Harper, is it safe to say that Mr. Vowels-Harper and

19   people with ASD, essentially excepting their neurological

20   processes, they have the same biology as everyone else?

21   A.  Yes.

22   Q.  They have the same desires for love and affection.

23   A.  Yes.

24   Q.  They have the same desire for community.

25   A.  Yes.

Wagner - Direct

1   Q.  They have the same desire for connect -- you know,

2   connection or interaction; is that correct?

3   A.   Yes.  For them it's a yes and no because often the

4   interactions are very awkward, and they do tend to find

5   themselves alienated.  I think in his case, he's very

6   affiliative.  He wants to be around people.  He wants to have --

7   he's hungry for relationships with people.

8   Q.  So his body at 21 would have the same hormones, for

9   example --

10  A.   Right.

11  Q.  -- as a normal 21-year-old.

12  A.   That's right.

13  Q.  But his brain isn't acting like a normal 21-year-old.

14  A.   That's right.

15  Q.  And so he would have the same sexual impulses as a 21-year-

16  old, but he would not know how to understand and manage those

17  because of his ASD compared to somebody of the same age?

18  A.   That's right.

19  Q.  You've testified that in Mr. Vowels-Harper's circumstance

20  but also in your knowledge of people with ASD, they have very

21  few social outlets available to them.

22  A.   That's right.

23  Q.  And they really do not know how to initiate social

24  relationships.

25  A.   They have a more difficult time.  It's awkward, yeah.

Wagner - Direct

1    Q.  He's clearly limited in the area of knowing what's

2    appropriate or inappropriate.

3    A.  Yes, yes.

4    Q.  And he's also very clearly limited by virtue of his ASD in

5    knowing what's socially acceptable.

6    A.  That's right.

7           MR. RICKETTS:  Your Honor, can I have just one moment,

8    please?

9           THE COURT:  Yes.

10   BY MR. RICKETTS:

11   Q.  I want to go back to something you testified to.  You

12   testified that -- when we talked about the present offense and

13   your interview with Mr. Vowels-Harper, you indicated that he

14   wanted to take responsibility, that he understood it was wrong

15   now, but he may not have at the time; correct?

16   A.  Yes.

17   Q.  So I want to peel that back a little bit because I think

18   what I heard you say was that he knows now because it's been

19   clearly told to him but that he may not understand the why

20   behind why it's inappropriate.  Is that fair?

21   A.  I think he has a much better understanding of the reality of

22   the situation than he had at the time because it's been broken

23   down for him.

24   Q.  And that's because you or me or the system itself has

25   actually told him and said, "Hey, this type of social

Wagner - Direct

1   interaction or sexual interaction is inappropriate and you can't

2   do that."

3   A.   Yes, yes.

4   Q.   Correct?

5   A.   Yes.

6   Q.   But what I'm getting at is somebody with ASD and

7   Mr. Vowels-Harper specifically is limited in really

8   understanding the why behind that.

9   A.   Yes.

10  Q.   Okay.  That's what I'm getting at.  Could you kind of

11  explain that generally.  I mean, he can say, "I know it was

12  wrong," but does somebody with ASD -- and in this case

13  Mr. Vowels-Harper -- have a really difficult time understanding

14  the why behind that?

15  A.   Yes, I think that's true, that he has a hard time

16  understanding the impact that it may have had on the girl.  You

17  know, even now, I think that he has some -- you know, some

18  uncertainty about "So how did that hurt her?" because she was an

19  active participant in the conversation.  Is that answering your

20  question?

21  Q.   Yes.  I mean, that's kind of what I'm getting at.  You know,

22  ultimately there is a barrier there.  And, you know, you've

23  heard -- we've all heard stories of loved ones who have had

24  loved ones or family members, children with ASD, and they've

25  always testified or talked about how there's just this veneer or

Wagner - Direct

1    barrier that they're just not sure they're getting through.

2    A.   That's right.

3    Q.   And that's been attributed -- from what I've heard you say,

4    that's been attributed to the characteristics of ASD where they

5    just don't fully understand social cues and norms.

6    A.   Yes.

7    Q.   And they don't understand social interactions.  And what I'm

8    hearing you say is that that's all biological; correct?

9    A.   Well --

10   Q.   Let me say this:  It's from birth.

11   A.   In large part, people with ASD have a hard time grasping

12   concepts in a lot of ways.  The more abstract the concept, the

13   more difficult it is for them.  So understanding the complexity

14   of the potential damage that comes from an interaction that he

15   had with the girl, I think that would take some work for him to

16   come to an understanding beyond a concrete level.

17   Q.   As far as this idea -- you've heard testimony about this

18   idea of supervised release or being on some form of court

19   monitoring outside of incarceration or something short of

20   incarceration.  You heard the testimony of the parents saying

21   they would provide him with an environment.

22   A.   Yes.

23   Q.   After you have had an opportunity to test Mr. Vowels-Harper

24   and understand his history, and you had an opportunity to

25   interact with the family, do you believe that a type of

Wagner - Direct

1    placement with his family under close supervision of loved ones

2    would be a healthy and safe placement for Mr. Vowels-Harper?

3    A.   Yes.

4    Q.   And do you think that that would also be an environment

5    which could ensure the safety of the community?

6    A.   Yes, yes.  I think -- I mean, restrictions are in place and,

7    you know, in a lot of cases that I can think of, that keeps the

8    community safe.

9    Q.   And as part of that, of course, I heard you say that you

10   would expect or find it best practice to have him actively

11   involved in individual therapy at the same time.

12   A.   Yes, yes.

13           MR. RICKETTS:  Thank you, Judge.  That's all the

14   questions I have.

15           THE COURT:  Before your cross-examination, we're going

16   to have to take another break at this point.  You may step down,

17   but I would ask you to observe the formalities and restrict your

18   communication prior to the cross-examination.  We'll take about

19   ten minutes.

20           MR. RICKETTS:  Your Honor, before -- I don't want to

21   forget.  I'm gonna move to introduce the report as an exhibit,

22   my only exhibit.

23           THE COURT:  Is that the report?

24           MR. RICKETTS:  Yes, sir.

25           THE COURT:  That's fine.  Without objection?

Wagner - Cross

1                 MR. MCKINESS:  No, sir.  It's part of the record.

2         (Defendant Exhibit 1 admitted in evidence and filed under

3     seal.)

4         (Recess at 1:30 p.m. until 1:44 p.m.)

5                 THE COURT:  Thank you.  We're back on the record.

6     Mr. McKiness.

7                 MR. MCKINESS:  Thank you, Your Honor.

8                          CROSS-EXAMINATION

9     BY MR. MCKINESS:

10    Q.  Dr. Wagner, I'm the prosecutor in this case, Mr. McKiness.

11    Let me start off by just diving into your report.  Your report

12    references on page 11 -- do you have a copy of it with you?

13    A.  I do.

14    Q.  Great.  That Mr. Vowels-Harper underwent a forensic

15    neuropsychological evaluation by a Dr. Edelson in March of '23.

16    A.  Uh-huh.

17    Q.  And you reviewed that forensic evaluation?

18    A.  Yes.

19    Q.  And that report found that the defendant was depressed and

20    anxious about his current situation.  That current situation

21    referenced is this prosecution; right?

22    A.  Yes.

23    Q.  And isn't that kind of to be expected for someone who is

24    facing serious time for these crimes?

25    A.  Of course, yeah.

Wagner - Cross

1    Q.  In your summary of Mr. Edelson's report, you quoted that

2    Mr. Vowels-Harper did not seem to differentiate between

3    adolescent females and older ones.  I'm on page 11 still.  Is

4    that statement in conflict with your assessment that the

5    defendant is not attracted to underage girls?

6    A.  I guess it depends on what you -- what Dr. Edelson is

7    talking about -- in his interviews with Mr. Vowels-Harper, he --

8    he didn't seem to make a distinction between adolescents and

9    adults.

10   Q.  If I could jump in.  Are you saying that -- you're saying

11   that he doesn't make any distinction between underage or above

12   age, but he's just not targeted towards underage?

13   A.  That's what I'm saying.

14   Q.  Okay.  So that's what you're saying.  So it doesn't make any

15   difference.  He's just not focused on underage girls?

16   A.  That's right.

17   Q.  All right.  So, yes, when you say he's not a pedophile, what

18   you mean is he's not solely attracted to that young age group,

19   the minor age group?

20   A.  Well, minor -- prepubescent.

21   Q.  Prepubescent, yes.  Sorry.  All right.  And to your

22   knowledge was the victim in this case prepubescent?

23   A.  Not to my knowledge.

24   Q.  Dr. Edelson's report also states that nude photos were said

25   to provide some form of gratification in terms of stress relief

Wagner - Cross

1    rather than pleasure.

2    A.   Uh-huh.

3    Q.   That's on page 11 of your report.  The very last paragraph,

4    about five lines up from the bottom on page 11, it says that

5    nude photographs were said to be -- or said to provide some form

6    of gratification in terms of stress release rather than

7    pleasure.  And it goes on to state that -- well, let me step

8    back.  Do you know who said that from this part of the report?

9    Is that from Dr. Edelson?

10   A.   This whole paragraph is kind of a summary of what -- what he

11   said in his report.

12   Q.   Okay.  Does it matter whether he sought nude photographs and

13   videos of a 12 year old for stress release or sexual

14   gratification?  Is that relevant?

15   A.   It's still inappropriate, yeah.

16   Q.   And as a human being, won't we always experience stress for

17   one reason or another throughout the remainder of our lives?

18   A.   Right.

19   Q.   And aren't there plenty of nude photographs of adult women

20   on the internet?

21   A.   Yes.

22   Q.   And so the defendant wouldn't necessarily need to seek out

23   nude photographs from a 12 year old?

24   A.   That's right.

25   Q.   Your report includes information obtained from

Wagner - Cross

1  Mr. Vowels-Harper's parents.

2  A.  Uh-huh.

3  Q.  And how did you decide to talk to them in conducting your

4  review in your report?

5  A.  What was the first part of your question?

6  Q.  You spoke --

7  A.  With his parents.

8  Q.  -- his parents.

9  A.  Uh-huh.

10  Q.  And how did you decide to talk with them in conducting your

11  review in your reports?

12  A.  That would be a routine part of my evaluation.

13  Q.  All right.  And it's customary for -- to talk to parents for

14  certain types of assessments?

15  A.  Yes, or -- well, significant people in the situation.  So --

16  Q.  Okay.

17  A.  -- here it was parents.

18  Q.  And how do you evaluate the parents' results in terms of,

19  you know, truthfulness and accuracy?

20  A.  Well, of course, the -- I would expect them to be biased and

21  -- but they also gave me a lot of history, and they were

22  consistent in the reports that they made to me.

23  Q.  Okay.  Do you think that the parents might have an incentive

24  to exaggerate the severity of the defendant's emotional and

25  social impairments?

Wagner - Cross

1   A.   What I know is that -- well, I mean, of course they're gonna

2   defend their son, but what they told me was what was consistent

3   with the other documentation that I had from earlier

4   evaluations.

5   Q.   All right.  Your report indicates that his mother stated

6   that as a kid he was such a rule follower, yet the defendant's

7   childhood disciplinary record is a little different based on

8   what I've seen in your report.

9       On page 4, I think it says that in kindergarten he got into

10  an altercation with classmates and was throwing chairs.  He also

11  squirted hand sanitizer in the girls' faces.  And in the

12  defendant's own words, he says he was a "wild child."

13  A.   Yeah.

14  Q.   So his assessment of himself is a little different than the

15  assessment of his mother in that situation.

16  A.   Well, apparently, no.  She talked about him having a lot of

17  trouble in his early days in school.  He's a rule follower now,

18  but he wasn't then.

19  Q.   Okay.  I just only say it because it states that as a kid he

20  was a rule follower.

21  A.   Okay.

22  Q.   But you're saying he's a rule follower now but maybe not

23  back then?

24  A.   Yeah, clearly not then.

25  Q.   Okay.  And we talked about the pedophilia stuff.  Did you --

Wagner - Cross

1    were you asked to conduct any tests on whether the defendant is

2    a pedophile?

3    A.   Well, there are no tests for that, but that was one of the

4    questions that was raised, you know, is -- I wouldn't normally

5    even address that -- you know, that diagnosis, but because it

6    was brought up, I spoke to it in the conclusion.

7    Q.   Right.  But you said there's not really a test for that?

8    A.   That's right.

9    Q.   And so the reason you made that determination was because

10   you were asked?

11   A.   That's right.

12   Q.   Did you administer a polygraph?

13   A.   No.

14   Q.   And, frankly, you couldn't because he was incarcerated;

15   right?

16   A.   That's right.

17   Q.   And so you wouldn't have been able to contact him?

18   A.   That's right.

19   Q.   All right.  And so you wouldn't have administered a

20   plethysmograph either?

21   A.   That's right.  I don't think we even have that in Kentucky

22   anymore.

23   Q.   Did you administer any type of physiological testing?  I

24   assume the answer is no again.

25   A.   Yeah, no.

Wagner - Cross

1    Q.  And did you prepare your report yourself?

2    A.  Yes.

3    Q.  Was the report based on anything that's not listed in the

4    report on that -- the first two pages?

5    A.  I don't think so.

6    Q.  All right.  So you didn't administer any tests that aren't

7    listed in your report?

8    A.  Not for this report, that's right.

9    Q.  And how did you determine which tests to administer?

10   A.  Well, I guess there's kind of a standard battery depending

11   on where the person is in the legal system and what the referral

12   question is, you know.  So I think it's mostly -- most of it was

13   based on history, and that was really extensive.

14   Q.  When you say "most of it," are you saying most of your

15   report was based on the history?

16   A.  Yes.  I mean, there were a lot of documents to review.

17   Q.  Okay.

18   A.  And then I wanted to know how his functioning was and kind

19   of where the autism was.  Do I agree that he has autism?

20   Q.  Right.

21   A.  So I did that and I looked at the ADHD and empathy and so on

22   in kind of broad personality measures as well as intellectual

23   ability.

24   Q.  And which jail did these evaluations take place in?

25   A.  That was in Oldham County --

Wagner - Cross

1    Q.  Oldham County.

2    A.  -- primarily, and then I saw him another time in Grayson

3    County.

4    Q.  During your testing, were there any distractions that could

5    have led to an underestimation of Mr. Vowels-Harper's

6    performance?

7    A.  In terms of which -- which test?  I don't think that there

8    was a distraction that would have affected the validity of the

9    test.

10   Q.  Okay.  How long did you meet with Mr. Vowels-Harper?  I know

11   it was over several days, but can you ballpark it?

12   A.  Oh, gosh.  I don't know.  I met with him for a couple of

13   hours a couple of times in Oldham County, and then I met with

14   him several hours in -- I don't know how long -- several hours

15   in Grayson County.

16   Q.  And when you met with him and conducted your evaluations and

17   testings, were you able in each sitting to complete an

18   evaluation?  So essentially what I'm asking is did you ever

19   administer a test that you had to kind of stop in the middle and

20   then come back a different day to finish it?

21   A.  I don't think so.  I think that it was all concluded.  They

22   were wrapped up after each session.

23   Q.  All right.  And was anyone else present during your

24   questioning of Mr. Vowels-Harper?

25   A.  No.

Wagner - Cross

1    Q.  And so you conducted, I guess, the Autism Spectrum Quotient,

2    the AQ.  What's the format of that test?

3    A.  I might have it with me.

4    Q.  I mean, is it like multiple choice?  Essay?

5    A.  Yes.  What --

6    Q.  Oral?

7    A.  It asks -- it gives a statement of -- I don't know.  And

8    then it asks how -- how often does this happen for you?

9    Q.  Okay.

10   A.  And then it's, you know, "slightly, mainly, never."

11   Q.  Right.  And when you administered that test, did he have the

12   paper, or were you kind of like reading from it and then writing

13   down his answers?

14   A.  I think that one -- I think that one he filled out himself.

15   Q.  Okay.  And what do you do in that type of test to ensure

16   that the person taking the test answers the questions honestly

17   and in good faith?

18   A.  Some of the tests have validity indices that are built into

19   them.  And the only one that -- of the instruments that I used

20   that had that was the PAI, the Personality Assessment Inventory,

21   and that indicated a valid profile.

22   Q.  All right.  But the AQ doesn't have that?

23   A.  That's right.

24   Q.  The PAI of all the tests you administered is the only one

25   that has the validity indicators?

Wagner - Cross

1  A.  That's right.

2  Q.  All right.  And you said presented valid?

3  A.  Uh-huh.

4  Q.  Okay.  All right.  In your report, you wrote on page 18 that

5  Mr. Vowels-Harper is not a pedophile and that his behavior is

6  rather reflective of his lack of social skills, impaired

7  judgment, and immaturity.  And you also stated that there's no

8  indication of him being attracted to or pursuing underage girls

9  since becoming an adult.

10 A.  Yes.  Most of the people that he's had sexual interactions

11 with have been age-mates, starting when he was a teenager and

12 now into adulthood.

13 Q.  Okay.  And you stated in your direct examination that you

14 read some of the chats from the PSR, but it didn't change your

15 assessment of the defendant because you didn't see how the chats

16 started.

17 A.  That's right.  Yeah, and that was -- I got that after this

18 was finished.

19 Q.  Sure, yeah.  And so it wouldn't have been involved in your

20 report anyway.

21 A.  Right.

22 Q.  But you said it wouldn't have changed your report had you

23 read what was in the PSR.

24 A.  That's right.

25 Q.  And I take it that's because you don't know if the minor

Wagner - Cross

1    started the conversation that way or steered it that way and

2    that Mr. Vowels-Harper was responding to it.

3    A.   That's right.

4    Q.   Okay.  I'm gonna show you the beginning of the chats from

5    that day on April the 18th.  Can you see that on your screen?

6    A.   Yes.

7    Q.   And the victim starts off by saying, "Hey."  And the -- and

8    that's on the right side.  The response is the left side.

9    A.   Uh-huh.

10   Q.   And the response from Mr. Vowels-Harper is, "RU busy?"  The

11   victim then states --

12           THE COURT:  Mr. McKiness, can we redact the minor

13   victim's name?

14           MR. MCKINESS:  Yeah, I didn't realize that that was on

15   there.

16           THE COURT:  Could you maybe just step back to counsel

17   table and do that, or if you can do it there, that's fine.

18           MR. MCKINESS:  I actually couldn't see that.

19       I think that blocks it out pretty good there.

20   BY MR. MCKINESS:

21   Q.   And the victim then responds, "I'm watching the news rn,"

22   right now, "and doing homework but what's up?"  And then can you

23   read what the response was from Mr. Vowels-Harper.

24   A.   Yes.  Yes, he says, "Wanna see my cock."

25   Q.   All right.  Based on this interaction, who do you believe

Wagner - Cross

1    started this sexual conversation?

2    A.   Well, in this interaction, that was him.

3    Q.   Right.  And in the PSR, there are chats that start with the

4    part that you just read.

5    A.   Uh-huh.

6    Q.   And during that large section of chats, the defendant asks

7    for a lot of sexual pictures.  One of the things he says is,

8    "Can we video chat.  Are you wearing panties?  If you could do

9    porn professionally at 13, would you?  You should make an only

10   fans.  Can I see a vid of you smiling while saying hi Chase with

11   your tits out."  It goes on to him asking for nude videos and

12   videos of the minor masturbating and other objects.

13   A.   Uh-huh.

14   Q.   With that context, does that change your opinion that you

15   had in your report?

16   A.   Again, I would want to know where they were in the -- like

17   how did -- when did they first meet and what was the -- kind of

18   the progression of the dialogue there?  Was that part of

19   their -- part of the conversation along the way?  I mean, what

20   you're saying is a much more aggressive approach to their

21   interaction than he described.

22   Q.   Right.  And so would it be fair to say that you would not

23   have expected this aggressive tone based on your interactions

24   with Mr. Vowels-Harper?

25   A.   That's right.

Wagner - Cross

1    Q.  And because you've stated that you've already read the other

2    portions from some of the chats from the PSR, I'm not gonna ask

3    you about them because you've already said that would not have

4    changed your opinion before reading what we read today.

5        Your report also references several other times the

6    defendant had sexual interests in minors other than himself.

7    These include his, you know, interaction with a younger niece of

8    his when he was 11 years old.

9    A.  That's right.

10   Q.  Now, you've stated that there was no history of him having

11   inappropriate conduct with people younger than himself.  Was

12   that in relation to him being an adult --

13   A.  Yes.

14   Q.  -- only?  So that doesn't factor into the stuff when he was

15   a minor?

16   A.  That's right.  Yeah, that wouldn't be used as part of his

17   diagnosis.

18   Q.  All right.  And to be fair, at this time Mr. Vowels-Harper

19   was 20, 21 years old?

20   A.  Yes.

21   Q.  So there wouldn't have really been much of a history of him

22   as an adult?

23   A.  That's right.

24   Q.  And you wrote in your report on pages 17 and 18 that, quote,

25   his experience with image -- intimate/romantic relationships is

Wagner - Cross

1    very limited.

2    A.   Uh-huh.

3    Q.   But your report also notes that he dated around four girls

4    and had relationships that lasted between 6 to 18 months; right?

5    A.   I don't remember that.

6    Q.   Okay.

7    A.   I know that the early relationships that he had in high

8    school, they lasted for a long time, but I also know that those

9    were not sexual relationships.  I think he said he's had like

10   nine sexual partners --

11   Q.   All right.  And so --

12   A.   -- to date.

13   Q.   -- by the time he was 20, 21 years old, you said he'd had

14   about nine sexual partners?

15   A.   Uh-huh, but no real relationships.

16   Q.   Okay.  So nine sexual partners but no real relationships.

17   But when he was a teenager, he had several real relationships

18   based on the reporting?

19   A.   In high school, yeah.

20   Q.   Okay.  And, you know, I guess he wasn't extremely far

21   removed from high school at this point.

22   A.   That's right.

23   Q.   So, you know, nine sexual partners by the age of 22, that's

24   more than a limited number of sexual experiences at least?

25   A.   Right.  You're right.

Wagner - Cross

1    Q.  And I'm trying to speed through here because I -- I know

2    you've got the time constraints.

3    A.  Thank you.

4    Q.  I'm skipping over some stuff.  You mentioned something in

5    your direct testimony about people with ASD not picking up on

6    nonverbal communication and cues.

7    A.  Right.

8    Q.  But is that really a factor in a relationship where you're

9    chatting and just talking via text and not having nonverbal

10   communication?

11   A.  That's right.

12   Q.  And you talked a lot about the immaturity that

13   Mr. Vowels-Harper has that you say is based on his ASD, but

14   you're not saying that immaturity excuses criminal conduct;

15   right?

16   A.  Of course not.

17   Q.  And you're not saying that just because someone's immature

18   means that they would, you know, have sexual interactions with

19   someone that's younger than them or a minor?

20   A.  That's right.

21   Q.  But you did say that -- well, let me -- are you saying that

22   people with ASD don't understand sexual boundaries, or are you

23   saying that they kind of just -- they recognize a sexual

24   boundary, but it doesn't -- it just doesn't matter to them in

25   some type of way?

Wagner - Cross

1    A.   I think they lose sight of the boundaries because they're

2    focused more on the interaction that's happening.

3    Q.   Right.

4    A.   So they're responding to the -- to whatever is being said or

5    what they're seeing or --

6    Q.   Right.

7    A.   -- something else besides the boundary.

8    Q.   In a situation where, let's say, he recognizes that it's,

9    you know, inappropriate to have a sexual conversation with

10   someone that's a minor, but if they have a good conversation and

11   it goes that way, he's gonna disregard that because he's so

12   focused on that interaction?

13   A.   He would tend to do that.

14   Q.   And the only way that you think that would change would

15   be -- I assume, if it can change, would be through like

16   one-on-one treatment and counseling?

17   A.   I think that would be the best approach to help him and to

18   keep the world safe.

19   Q.   Right.  But if he didn't do that, then we could probably be

20   in the same situation again?

21   A.   That's right.

22   Q.   And you mentioned that Mr. Vowels-Harper was prone to be a

23   follower.

24   A.   Yes.

25   Q.   Right?  But that doesn't mean he's gonna be a follower in

Wagner - Cross

1    every interaction.

2    A.   That's right.

3    Q.   Or every relationship.

4    A.   That's right.

5    Q.   And then you spoke about prison conditions, and I believe

6    you said that prison would be inappropriate for

7    Mr. Vowels-Harper.  Can I ask you, when was the last time you

8    visited a federal prison?

9    A.   I don't know that I've ever been in a federal prison.

10   Q.   All right.  And so that means you would have never visited,

11   like, a federal medical correctional facility?

12   A.   That's right.

13   Q.   Or been to a prison that has the sex offender treatment

14   program?

15   A.   Well, not a federal prison but --

16   Q.   Right.

17   A.   -- state prison certainly.

18   Q.   Right.  But I'm just talking about, like, federal prisons.

19   A.   Right, right.

20   Q.   So you kind of haven't been exposed to that?

21   A.   That's right.

22   Q.   And so you don't know if they have programs or, you know, a

23   set of procedures for people with Asperger's or ASD?

24   A.   That's right.

25   Q.   But you wouldn't be surprised to learn that the Bureau of

Wagner - Redirect

1    Prisons actually does have facilities and treatments for people

2    with that diagnosis?

3    A.   I wouldn't be surprised that they have treatment programs

4    for people with sex offenses, but I don't -- I don't know of

5    anyplace that has specific -- maybe they do, but I would be

6    surprised if they had programs specifically for people with

7    developmental disabilities like that.

8    Q.   Okay.  And, lastly, there was some talk about the victim

9    looking older, like she was -- how old did Mr. Vowels-Harper

10   say, like 15 or 16 or something like that?

11   A.   He thought he was talking to somebody that was 16 or 17, but

12   you said --

13   Q.   Right, 16 or 17.  And if that were true, wouldn't all this

14   conduct still be illegal?

15   A.   Yes.

16           MR. MCKINESS:  No further questions, Your Honor.

17           THE COURT:  Any redirect?

18           MR. RICKETTS:  Briefly, Judge.

19                       REDIRECT EXAMINATION

20   BY MR. RICKETTS:

21   Q.   Doctor, you asked -- Mr. McKiness asked you a question about

22   nonverbal, and I guess the suggestion was because it was on chat

23   it wasn't verbal.  I think that's how I understood.  But would

24   nonverbal in your -- I'm asking, does nonverbal mean in your

25   mind reading the words as well as speaking the words?  You

Wagner - Redirect

1    talked about somebody with ASD not picking up on verbal cues or

2    nonverbal cues.

3    A.   That's right, yeah.  Even verbal cues, they're gonna be

4    confused by language.

5    Q.   But it doesn't necessarily have to be spoken.  It could be

6    written.  That same limitation that you've testified to that he

7    has would --

8    A.   That's right.

9    Q.   -- exist whether it's spoken or written.

10   A.   That's right, that's right.

11   Q.   Okay.  And also we talked a lot about these chats.  I guess

12   what I want to focus on is, on page 3 of your report, there's a

13   section regarding what Mr. Vowels-Harper said.  It was your

14   understanding from what he told you that they -- that the chats

15   that you just saw were from Snapchat.  It's your understanding

16   that -- from him that the chatting between them began on a

17   different media platform.

18   A.   On videos, right.

19   Q.   Okay.  So there -- he said Twitter or Instagram or something

20   like that.  So based upon what he said, there was, I think, two

21   or three months of chatting history that occurred prior to these

22   inflammatory texts which were put up today.  Is that correct?

23   A.   Yes.

24   Q.   That was what he reported?

25   A.   That's my understanding, yes, sir.

Wagner - Redirect

1    Q.   Okay.  And, again, we talked about the language that was

2    contained in those texts.

3    A.   Uh-huh.

4    Q.   And we talked about him using those words and the -- by

5    virtue -- I may not be very artful in it, but what I recall you

6    testifying to was that because of his ASD, he would be using

7    terms and speaking in a way that he thought was socially

8    appropriate or he thought was necessary for reasons than

9    somebody who didn't have ASD.  Like, the use of those words and

10   the manner of that communication would be different for somebody

11   who had ASD versus somebody who did not.

12   A.   I understand what you're saying.  There was also kind of an

13   element of competition between him and other guys.  You know,

14   they were doing this, and so he thought he should do that too

15   'cause that's what guys are supposed to do.  The language, I'm

16   not -- I'm not sure of, but, you know, I would -- my

17   understanding would be that he would think that that's the

18   vernacular that you use.

19   Q.   Because he may have heard that from other places and he

20   doesn't understand the social norm associated with using it?

21   A.   That's it.

22        MR. RICKETTS:  Thank you.  That's all I have.

23        THE COURT:  Thank you.  You may step down.

24   What next, Mr. Ricketts?

25        MR. RICKETTS:  That's all the witnesses I have, Your

1    Honor.

2              THE COURT:  Having heard the witnesses, do you wish

3    now to address your first departure motions?

4              MR. RICKETTS:  Yes, Your Honor.  I'd ask the Court to

5    grant Mr. Vowels-Harper a departure based on 2K2.10 and

6    5K2.22 --

7              THE COURT:  Let's take them up -- let's take them up

8    in order.  The first one is?

9              MR. RICKETTS:  5K2.10, victim's conduct.  And in

10   support of this, an important part which segues nicely from the

11   end of the redirect is that this chat history between the victim

12   and Mr. Vowels-Harper leading up to what was presented in court

13   today does not exist.  We had inquired early on in this case.

14   The United States unequivocally informed us that chat history on

15   other social platforms did not exist or was not available.  So

16   we are without the benefit of verifying independently the

17   statements which Mr. Vowels-Harper has made.  And, therefore, we

18   must --

19             THE COURT:  Hold on just one second.  You're able

20   to -- you're unable to verify what?

21             MR. RICKETTS:  The chat history between

22   Mr. Vowels-Harper and the minor victim prior to the chats that

23   were produced in discovery.

24             THE COURT:  Prior to the ones that are reported in the

25   PSR?

1          MR. RICKETTS:  Yes, sir.

2          THE COURT:  But you're not now raising for the first

3     time the validity of the chat record reported in the PSR?

4          MR. RICKETTS:  Those are certainly valid.  Those

5     are -- we don't dispute the validity of that chat history.  But

6     as it relates to this particular departure, in the context of

7     Mr. Vowels-Harper, who has ASD -- and that has not been rebutted

8     today, that his ability to understand social norms and him being

9     highly influenced and susceptible to the activity of others has

10    to be looked at in the lens of the chat history that does not

11    exist or is not available because that's a continuum to take

12    something that happened -- that chat didn't just pick up where

13    it's suggested that it might have picked up here today in the

14    courtroom.  The chat between them went on for months prior to

15    that time.  And we also understand and it's unrebutted that she

16    initiated the contact with Mr. Vowels-Harper.

17       So my argument is that based upon the testimony of his

18    parents and the testimony of Dr. Wagner, that an individual with

19    ASD, Mr. Vowels-Harper, and the characteristics that he presents

20    makes him more susceptible to the conduct of a victim.  And so I

21    believe that the Court can grant that departure.

22          THE COURT:  The Government's response?

23          MR. MCKINESS:  Quickly, Your Honor, as the defense

24    knows and has stated repeatedly, that this section kind of

25    unequivocally does not apply to sexual offenses, and the

1   arguments are speculative about chats that neither party has and

2   can't confirm.  So there's nothing in the record that supports

3   that argument other than, you know, I guess, what

4   Mr. Vowels-Harper says.  But even then, even if that's right,

5   the reaching out by a 12 year old to an adult male would not get

6   this policy statement to apply.  It just doesn't apply to sexual

7   offenses, and nothing we've heard today would change that.

8         THE COURT:  Anything further, Mr. Ricketts?

9         MR. RICKETTS:  No, Your Honor.

10        THE COURT:  I'm gonna deny the motion for downward

11  departure based on the policy statement at 5K2.10.  I'll note in

12  doing so that the policy statement says that if the victim's

13  wrongful conduct contributed significantly to provoking the

14  offense behavior, the Court may reduce the sentence below the

15  guideline range to reflect the nature and circumstances of the

16  offense.  There is no wrongful conduct here in the record

17  attributable to the victim, who was 12 years old.

18     The Policy Statement goes on to say, "In deciding whether a

19  sentence reduction is warranted and the extent of such

20  reduction, the Court should consider the following:  The size

21  and strength of the victim, or other relevant physical

22  characteristics, in comparison with those of the defendant."

23  That's not relevant here.

24     "(2) The persistence of the victim's conduct and any efforts

25  by the defendant to prevent confrontation."  That factor's not

1    relevant here.

2        "(3) The danger reasonably perceived by the defendant,

3    including the victim's reputation for violence."  That's not a

4    factor relevant here.

5        "(4) The danger actually presented to the defendant by the

6    victim."  Again, not relevant here.

7        "(5) Any other relevant conduct by the victim that

8    substantially contributed to the danger presented."  Again, not

9    relevant.

10        And, finally, "(6) The proportionality and the

11    reasonableness of the defendant's response to the victim's

12    provocation."  Even if that were relevant here, I think the

13    imbalance speaks for itself based upon the accepted facts and

14    the age disparity at issue here.

15        And, finally, the Policy Statement says, "Victim misconduct

16    ordinarily would not be sufficient to warrant application of

17    this provision in the context of offenses under Chapter 2, Part

18    A, Subpart 3, Criminal Sexual Abuse.  In addition, this

19    provision usually would not be relevant in the context of

20    nonviolent offenses."  So I'm going to overrule the motion with

21    respect to 5K2.10.

22        The next one?

23            MR. RICKETTS:  Yes, sir, 5K2.22 relative to the

24    defendant's age.  Again, he's -- it's undisputed at the time of

25    the crime he was 21.  However, it's also clear from the

1    testimony today that he is -- his linear age is not reflective

2    or indicative of his age by virtue of his ASD.

3        His mom and dad both testified that even when he was 16 or

4    17, he was more like a 10 or 11 year old.  He was, you know, in

5    after school care all the way through eighth grade.  This was

6    meaningless to him.

7        The testimony from Dr. Wagner is that he is not functioning

8    as a 21 year old by virtue of his ASD.  So my motion is that the

9    Court should consider a departure based upon the age that he

10   would have presented at age 21 based upon the testimony, which

11   would have been at least four or five, six or even more years

12   than he was by virtue of his birth.

13       MR. MCKINESS:  The United States essentially responded

14   to that in our sentencing memorandum, but what I would say is

15   that when we look at the factors set out in 5K2.22, you know,

16   there's age, extraordinary physical impairment, and drug/alcohol

17   abuse not being a reason.  So there's no physical impairment,

18   especially not one that's extraordinary.  And so the only real

19   argument is the age of the defendant.

20       And, you know, as this Court is well aware, many men in

21   their 20s come before this Court for crimes that are committed.

22   This is not really an exception to that rule.  I don't believe

23   that the defendant's age in particular is one that would require

24   a reduction specifically because of the age of the victim.  If

25   the victim were, say, 16 or 17 and the defendant is 20, with

1    that smaller age gap, you know, I think the Court could consider

2    making that reduction.  Even though it might not be appropriate,

3    I think it would at least be appropriate to consider whether it

4    would work.

5        With the victim being a 12 year old, you know, still in

6    middle school and the defendant being in his 20s, I think that

7    age discrepancy there doesn't do the defendant any favors.  And

8    so based on the age range between the victim and the defendant,

9    I don't think that the age in 5K2.22 should apply to reduce the

10   sentence at all.

11          THE COURT:  Mr. Ricketts, anything further?

12          MR. RICKETTS:  Your Honor, I would just try to

13   moderate that objection a little bit, to the extent that -- and

14   it's the same problem over and over again in this case.  We

15   can't compare Mr. Vowels-Harper to all the other male defendants

16   that have come before the Court.  He's not like all of them.  In

17   fact, I think there's -- I could only find one case in the Sixth

18   Circuit, the *Marshal* case I cited to the Court, that involved

19   someone who had a lower linear -- a lower age or practical age

20   or whatever that phrase was.

21       So, again, I think that you can find that there's a

22   physical -- it's physiological.  I mean, we know that this

23   problem is physiological.  That's undisputed.  We know it's not

24   psychological.  We know that it's neurological in his brain, and

25   we know that he didn't do anything to make him suffer from it or

1    to make him have it.  I think that it's reasonable to grant the

2    departure, and I'd just ask the Court to sustain my motion.

3         THE COURT:  I've carefully considered the factors set

4    out in the guideline here.  This is a policy statement at 5K2.22

5    which refers back to 5H1.1.  I'm gonna deny the motion for

6    downward departure.  I am not able to find that these

7    characteristics are present to an unusual degree and distinguish

8    this case from the typical cases of this type.  In denying the

9    motion for downward departure, I am not concluding that age

10   and/or immaturity may not also properly be considered in the

11   context of the Section 3553(a) factors.

12       All right.  I don't have the list in front of me,

13   Mr. Ricketts.  Was there another --

14        MR. RICKETTS:  There are no other motions for

15   departure.

16        THE COURT:  Very well.  Does the Government have any

17   motions to take up?

18        MR. MCKINESS:  No, Your Honor.

19        THE COURT:  Let me -- let me just state now for the

20   record that I will adopt the PSR.  We have referred both to the

21   July 30 PSR and the more recent revision dated November 15.

22   That just -- as I said, I think, at the outset of our hearing

23   today, that revised PSR was filed in order to acknowledge

24   receipt of the victim statement.  I will adopt the PSR and note

25   for the record that it will remain sealed but available to the

1  Court and counsel in the event of an appeal.

2      Let's shift now to a discussion of the sentencing factors

3  set out by Congress in Title 18 of the U.S. Code at

4  Section 3553(a).  Mr. McKiness, let me begin here with you and

5  ask what the Government's recommendation for an appropriate

6  sentence is in this case in consideration of those sentencing

7  factors.

8          MR. MCKINESS:  Yes, sir.  As you stated, the guideline

9  range is 262 to 327 months based on the PSR being an offense

10  level 39 with no criminal history.  The United States is asking

11  for a low end guideline sentence of 262 months as the best way

12  to punish Mr. Vowels-Harper for his criminal actions and reflect

13  the seriousness of his crimes.

14      Mr. Vowels-Harper is not a clueless victim who was coerced

15  into criminal conduct by a 12-year-old girl.  Mr. Vowels-Harper

16  knew what he was doing was criminal.  He acknowledged it, and he

17  did not care.  No impartial reader of the chat logs would think

18  Vowels-Harper was a victim or did not know what he was doing.

19      He repeatedly asked a 12-year-old girl to take lewd pictures

20  of herself or masturbation videos and send them to him.  He told

21  her he wished other girls her age were interested in adults and

22  that he wished the legal age wasn't 18 years old.

23      At one point in their conversation about contraceptives,

24  Mr. Vowels-Harper told the victim that she should ask her

25  parents about getting an IUD.  And when she told him that her

1    parents can't know and that they would call the cops, he

2    responded that he knew but didn't see anything wrong with just

3    asking about IUDs.  Vowels-Harper was fully aware of the

4    wrongfulness of his conduct.  He just did not care.

5        He also wasn't some naive inexperienced boy who succumbed to

6    the pressures of a 12-year-old girl.  Vowels-Harper has been in

7    plenty of relationships, both romantic and sexual, you know, by

8    the age that he was when he committed these in 2021.  He has had

9    over a half dozen sex partners and girlfriends in his teenage

10   years and early 20s.

11       The chat logs from this case also show escalating behavior

12   on his part and not on the minor victim's part.  You know, if we

13   try to even address the chats that don't exist and aren't before

14   the Court -- and, you know, the defense argument is that, you

15   know, the 12 year old started it.  But if that's the case,

16   Mr. Vowels-Harper absolutely finished it and escalated it.

17       The chat logs from this case show that Mr. Vowels-Harper

18   would not simply ask for topless videos or something else not as

19   involved.  You know, he would start off, if you look at the

20   chats, by asking for a little bit, like take a topless photo or,

21   you know, take a picture of yourself naked.  And then when the

22   victim would say yes, he would add something else to it, and he

23   would ask for more.

24       For example, on the April 19th chat, he asked her to send a

25   video with her breasts out.  And then after she agreed, he

1    quickly asked if she could take a video naked and then if she

2    could spread her legs and then play with her vagina.  And then

3    he asked her to stick a remote in her vagina.  An hour later, he

4    did it again, asking first for a topless photograph.  And after

5    she assented, he then asked her to send a video of herself fully

6    nude showing him her whole body.

7        Immediately after watching the videos, he asked her to show

8    her vagina to him up close.  Now, this shows a person starting

9    off with a small ask and upping the ante more and more after he

10   saw the green light.  This is deliberate.  The defendant may

11   claim he is not attracted to minors, but the evidence in the

12   chat logs seem to be to the contrary.

13       The defense has repeatedly said that Mr. Vowels-Harper is

14   not a pedophile despite the facts in this case.  But whether or

15   not Mr. Vowels-Harper is a pedophile or is not a pedophile is

16   irrelevant because at the very least, he's indiscriminate and

17   indiscriminate to age.  Nothing in Dr. Wagner's report supports

18   an argument that Mr. Vowels-Harper would not or could not be

19   involved in the exact same criminal conduct in the future.

20       Even if the Court took all the defendant's claims as gospel,

21   everything that the defendant claims across all aspects --

22   reports, missing chats, everything -- Vowels-Harper would still

23   have the same deficits that led to the charges in this case.  If

24   nude pictures helped sooth his stressors, as stated in

25   Dr. Wagner's report, why would he not seek those same type of

1    pictures in the future from other misguided 12-year-old girls?

2        And although the defense wants to make this sentencing

3    mostly about ASD, I want to talk about the effects the

4    defendant's crimes had on the victim.  Because of the sexual

5    abuse in this case, that child has been seeing a therapist

6    weekly, takes a regimen of medications to manage her stress,

7    mood, and sadness.

8        Her family has gone to the emergency room repeatedly because

9    the victim wanted to kill herself or tried to kill herself

10   because of the deluge of negative emotions and thoughts she

11   experienced from the sexual abuse in this case.  At one point

12   that child, the victim in this case, was committed to a

13   psychiatric hospital when she should have been worrying about

14   eighth grade graduation or starting high school.  She is a

15   frequent caller to the suicide hotline.

16       The family has uprooted and moved because the defendant had

17   the victim's home address.  The victim's family has been

18   tremendously impacted by the defendant's crimes, and they are

19   out thousands of dollars in medical expenses to treat the victim

20   mentally and emotionally.  There is a real victim in this case,

21   but it is not the defendant.

22       Lastly, in considering an appropriate sentence, I urge the

23   Court to consider the dismissed conduct in this case.  The

24   defendant was charged with three counts of production of child

25   pornography.  The Court is well aware of the contents of those

1    images and videos and what they depict.

2        And, you know, although the median sentence in -- for crimes

3    of convictions that we have here in front of us is only

4    240 months, a 262-month sentence is appropriate here because of

5    the serious production conduct that the guidelines do not take

6    into account.  The Court is permitted to depart upward based on

7    such conduct under 5K2.1, but the Government isn't asking for

8    that upward departure.  The Government is asking for a low end

9    guideline sentence.

10        A sentence of 262 months will send a message to the

11   victims -- to this victim that she will not be forgotten and

12   that these crimes are serious and that the Court will protect

13   the public from these types of crimes.  A mandatory minimum

14   sentence is unwarranted and inappropriate in this case

15   considering the defendant's conduct and the effect that it's had

16   on the victim and her family, her innocent family.

17        A low end guideline sentence is a severe penalty, but it's

18   not a harsh or inappropriate penalty.  Therefore, the United

19   States believes that a 262-month sentence is sufficient but not

20   greater than necessary to satisfy the considerations of

21   Section 3553(a).

22        And, you know, I do want to add that as I got into it with

23   Dr. Wagner, the BOP does have resources for people like

24   Mr. Vowels-Harper.  So he's not being sent to the wolves, so to

25   speak, to fend for himself.  The BOP does an assessment, as the

1    Court is well aware, and will put the defendant in a facility

2    that is appropriate for him based on their assessment of him.

3            MR. RICKETTS:  Your Honor, I -- before I make my

4    argument, I wanted to take an opportunity, out of an abundance

5    of caution, and ask the Court's indulgence in me renewing my

6    motion that the Court had already denied relative to the

7    unconstitutionality of the minimum mandatory in this case.  I

8    don't know if I need to --

9            THE COURT:  I don't need to do that.  Your motion was

10    made.  It was ruled upon.

11            MR. RICKETTS:  Okay.

12            THE COURT:  It's preserved in the record.

13            MR. RICKETTS:  Thank you.

14        That being said, certainly the Government can come in today

15    and make a strong, hard assertive argument about the facts of

16    the case, but what they can't do and what they shouldn't do is

17    what I believe leads to an unfair assessment of the facts of

18    this case.

19        Mr. McKiness uses the word "coercion" as though I put forth

20    that he was coerced.  He's used the word "victim" as though I've

21    made Mr. Vowels-Harper out to be a victim.  I never used those

22    terms.  I never characterized him as that.  So, first of all,

23    that -- all of those arguments should be marginalized.

24        The more important point on that topic is the impact on the

25    victim.  And I wouldn't be having this conversation if the

1    Government had not made this argument.  But of the 13 pages of

2    notes or 10 pages of notes provided to me in discovery from the

3    FBI agent's interview of the minor victim, there is one small

4    mention of my client.

5        Is it possible that all of the trauma that she has -- that

6    the United States reports about, is it possible that all of the

7    calls to the crisis center and all of the things that have been

8    taken from her in her youth had more to do with the fact that

9    she met up with two other men and actually engaged in

10   intercourse with those men prior to Mr. Vowels-Harper being

11   arrested?  I don't know.  We don't have testimony on that.  But

12   I'm inclined to believe that, yes, Mr. Vowels-Harper is

13   responsible to some extent for her trauma, but I don't believe

14   he is responsible for all of it.

15       And I guess the Court could say, "Well, I'm not gonna make

16   that distinction."  But for whatever reason, this girl engaged

17   in a lot of behavior prior to chatting with Mr. Vowels-Harper.

18   And as far as the severity of the conduct which she experienced

19   by other people, the actual contact and intercourse that she

20   would have had, I'm gonna ask the Court to consider, might be

21   more traumatic than sending a video.

22           THE COURT:  All right.  Let's -- for purposes of our

23   discussion here, if I accept that premise, what difference does

24   that make with respect to the determination of an appropriate

25   sentence in this case?

1      MR. RICKETTS:  Well, Your Honor, it could play into

2  the Court's consideration in determining the degree of the

3  variance which I've asked for.  I don't know.  These are the

4  areas of sentencing which are, you know, a little more --

5      THE COURT:  I asked the question because I'm not sure

6  where you're going with the fact that the 12-year-old victim

7  here may have been victimized also by others.  I'm not sure what

8  you're suggesting I do with that in terms of a motion for

9  downward variance.

10      MR. RICKETTS:  It's to balance this impassioned

11  argument from the United States that Mr. Vowels-Harper -- the

12  suggestion that's left in the well of the courtroom is that

13  Mr. Vowels-Harper is solely responsible for everything that's --

14  everything that this minor victim is experiencing.

15      I don't know to what extent the Court might consider the

16  variance, but to the extent that the Court has to balance the

17  interests of the victim in seeking the interests of justice, I

18  just need that to be known, that this is something -- it's not

19  as the United States has presented it at this -- in this

20  argument, that there's another side to this story.

21      Relative to the wrongfulness, yes, you heard testimony --

22  and, again, this is the reality of ASD.  We have our reality.

23  Everyone in this courtroom has their reality.  We will wake up

24  and we will do the things that we do in our life, and that is

25  our reality.  But Mr. Vowels-Harper is not our reality, and that

1    is unrebutted.  It's unrebutted that he sees the world

2    differently.

3       And I've never characterized him as a victim.  I've never

4    characterized him as being coerced, but it does shape and change

5    his ability to understand what's right from wrong.  It affects

6    his ability to -- in his use of language, in his engagement in

7    social interaction.  It makes him a lot more susceptible to

8    criminal behavior.  These are things that are beyond his

9    control.  That doesn't mean we treat him like an animal and lock

10   him up and throw away the key.  That's not what it means.

11      As far as the factors and the sentences available to this

12   Court, treating him like we would any other defendant, which is

13   what the United States is asking for, a low end guideline range

14   based upon a level 39, does not take into account everything

15   that the Court has heard today about Mr. Vowels-Harper.

16           THE COURT:  No.  I understand what you're saying.  One

17   of the factors, as you well know, for the Court to consider,

18   that I'm required to consider per that statute is

19   Mr. Vowels-Harper's history and characteristics.  So as I

20   understand it, your argument is that his ASD -- his immaturity

21   as a result of the ASD would suggest that a downward variance is

22   appropriate under that factor in 3553(a).  Is that where you're

23   going?

24           MR. RICKETTS:  Yes, Your Honor, yes.  However, I also

25   think the Court can consider it in the idea of the nature and

1    seriousness of the offense.  There's this objective standard

2    which you get to decide because you're the judge, and that's

3    your responsibility about what is the nature and seriousness of

4    this particular offense.

5        But I'd ask the Court to consider it from a perspective of

6    somebody who has ASD, at least try to.  I'm not really sure that

7    you would ever be able to do that any more than I would be able

8    to do it, but what we can take from the testimony of Dr. Wagner

9    is that it's different, and he may not be able to understand why

10   that relationship is inappropriate, which is kind of a big deal.

11   But, again, that doesn't mean that because he can't appreciate

12   it or may not ever be able to appreciate it that we should lock

13   him up and throw away the key.

14       What it means -- and I think under the sentencing factors

15   and the scheme is that we should tailor something that is

16   special for Mr. Vowels-Harper and -- because he has needs

17   different than any other -- or a vast majority of defendants

18   which come before this Court, and that has been unrebutted.

19       As the Court knows, the United States had plenty of

20   opportunities to have its own assessments of Mr. Vowels-Harper.

21   We delayed this case quite a bit early on because the United

22   States was looking into whether or not they were gonna have

23   their own independent evaluation done of Mr. Vowels-Harper.  And

24   ultimately the United States decided "We're not going to do

25   that" and has decided today simply to cross-examine Dr. Wagner

1    on his report.  But the cross-examination didn't change the

2    fundamental testimony, and that is that he perceives things

3    differently.

4        Now, you get to speak to the objective standard, but I

5    believe that considering the subjective standard for the nature

6    and seriousness of an offense is something that the Court can do

7    and is not precluded necessarily under the 3553 factors.

8        With regards to sentencing disparities -- I don't think I

9    put this in my sentencing memorandum, Judge, so -- the United

10   States Judicial and Sentencing Information has compiled data.

11   And in defendants in the selected cell which he has now found --

12   you have now found him to be in, which is 2G2.1 with a final

13   offense level of 39 and a criminal history category of I, that

14   report has indicated that during the last five fiscal years,

15   2019 to 2023, 98 defendants fit into this category.  And for the

16   98 defendants, their average length of imprisonment imposed was

17   222 months, and the median length was 240 months.  That is below

18   what the United States is asking.  I think the Court can take

19   that into account, in addition to the arguments I've made in my

20   sentencing memorandum relative to the disparity of sentences.

21       I also -- I don't want to -- I know the Court's reviewed it,

22   but I want to make mention again of the spreadsheet which I

23   attached or appended to my sentencing memorandum which as best

24   as I could exhaustively addressed cases like Mr. Vowels-Harper,

25   or in the same heartland of cases, which suggest that there is a

 1    very wide sentencing range for individuals like himself who are

 2    diagnosed with ASD, but I believe a vast majority of them are

 3    significantly below the guideline range.

 4         So I think the Court can consider and should consider all of

 5    these particular cases.  The Judicial Sentencing Information

 6    document that I found doesn't address ASD.  This is just

 7    straight up all defendants of the 98 that were sentenced in

 8    accordance with this.  So this is before you even consider the

 9    testimony that you heard today.  This other document more

10    narrowly focuses sentences down to defendants who are more like

11    Mr. Vowels-Harper.

12         Of course, the Court is aware that Mr. Vowels-Harper has no

13    criminal history.  An argument that I make is that a one is a

14    one and it's always a one, but the Court can consider the fact

15    that he's actually zero criminal history points and this is his

16    first time in the criminal justice system.

17         I think that Dr. Wagner built upon and actually made my

18    arguments stronger today relative to the need to protect the

19    public and rehabilitate Mr. Vowels-Harper.  I think that even

20    though he may not know what a federal prison is like, we know

21    that Dr. Wagner's very, very familiar with what state prisons

22    are like.  I'm not sure there's an argument that a state prison

23    is much different than a federal prison.  There might be some

24    funding differences, and they might be cleaner.  I'm not really

25    sure the population is any different.

1    But an argument that Dr. Wagner's testimony relative to what

2   would be inappropriate or appropriate for Mr. Vowels-Harper

3   doesn't change whether or not it's a state facility or a federal

4   facility.  The point is all facilities are going to be loud.

5   They're going to have some of the other issues that

6   Mr. Vowels-Harper is sensitive to, and all of them would tend to

7   put him in a different situation than the average inmate.

8    And so I think the Court can consider the testimony of

9   Dr. Wagner today as making my argument in my sentencing

10  memorandum that the rehabilitation aspect and the incarceration

11  aspect are stronger than when I filed this motion originally or

12  filed this memorandum originally.

13   Lastly, I think that the Court can take into account all the

14  family today and all the letters which I presented to the Court.

15  And I know that the Court read all those letters.  And all of

16  those letters -- from the standpoint of will the public be safe

17  with Mr. Vowels-Harper outside of jail, outside of prison, and I

18  think the Court can conclude that there is a situation or a

19  circumstance under which that can occur.

20   I think that an appropriate sentence in this case is

21  120 months.  And I think that the Court can put -- if it's

22  concerned about keeping the public safe, then he can be -- the

23  Court has at its discretion a lifetime supervision requirement.

24  And I don't think that based upon the sentence that I'm asking

25  for from the Court and under the circumstances presented by

1    Mr. Vowels-Harper that that is unreasonable.

2        I think that he is better served and the public is better

3    served giving him the minimum sentence that you can impose.  I

4    don't think you are diminishing the seriousness of the offense.

5    I don't think that you are diminishing the experience or the

6    trauma that the victim has incurred.

7        Unfortunately, the victim impact statement that's been

8    provided doesn't distinguish between Mr. Vowels-Harper and the

9    other defendants.  So, again, I don't know if there's -- or if

10   it even matters.  That's the victim impact statement from the

11   victim's father.  And it is what it is, but I don't think that

12   giving him that sentence says to that father or to that child,

13   "What you experienced isn't real," taking into account all the

14   other factors which this Court has to consider, which is not

15   simply punishment.  We're not here just to punish

16   Mr. Vowels-Harper.  Certainly that's a piece of what the Court

17   is considering, but that's not the only factor that the Court is

18   considering.

19       To sum up, Judge, I just -- I want to make mention of a few

20   things relative to the statements that the family provided.  You

21   had the benefit of hearing from Monika and Chris.  And, of

22   course, they provided letters.  But all of the other letters

23   that have been presented from first cousins, from sister, from

24   brother, from neighbors, from cousins, from -- all express love

25   and affection and support for Mr. Vowels-Harper, and they

1    express that this is not indicative of who he is.  You can take

2    all of those letters and the testimony today and reach this

3    conclusion that people with ASD, Mr. Vowels-Harper, struggle

4    every day in ways that we will never understand.

5        Again, it doesn't make him a victim, and it doesn't mean

6    that he coerced anybody, but his experience is something that no

7    one in this courtroom will ever understand or know.  He has the

8    same sexual desires.  He has the same desire for love and

9    affection.  He has the same desire for community, for social

10   interaction, but because of his brain, those will never be

11   normal as we know that term to mean.

12       The data does not suggest from the federal sentencing

13   guidelines that he is a likelihood -- has a likelihood to

14   re-offend, that he has a high likelihood to re-offend.  It's

15   actually very low.  His recidivism rate is extremely low based

16   upon the federal sentencing guidelines data.

17       He doesn't have a violent history.  Dr. Wagner also

18   testified that he's not violent.  And whether or not he is

19   indiscriminate or a pedophile -- unfortunately, we all had to

20   watch the videos.  The child is developed.  You know, she -- if

21   I had to talk about the Tanner scale, I could, but ultimately

22   she was developed.  She had pubic hair.  That doesn't -- I guess

23   by definition he's not a pedophile, but the argument that he's

24   indiscriminate, I believe, is unfair to some extent.

25       But I can also understand where the Government's arguing

1    that, "Well, if you're lonely, I guess you're willing to have an

2    interaction with anyone who's willing to have an interaction

3    with you."  I understand that, but that's where incarceration

4    isn't necessarily the answer.  It's the therapy piece of it that

5    Dr. Wagner testified to.  That's what's going to rehabilitate

6    and make Mr. Vowels-Harper a productive member of society, and

7    all the family that's here today will keep him safe and keep the

8    public safe.

9        I just ask the Court to show Mr. Vowels-Harper and his

10   family mercy.  I understand they're victims too, I guess,

11   because they lose a loved one by virtue of the conduct which

12   Mr. Vowels-Harper pled guilty to.  But we can mitigate their

13   pain with an expression of mercy, an expression of compassion

14   from the United States through the third branch, and I would ask

15   the Court to give Mr. Vowels-Harper the 120-month sentence and

16   lifetime supervision.  Thank you.

17               THE COURT:  Anything further, Mr. McKiness?

18               MR. MCKINESS:  No, Your Honor.

19               THE COURT:  Mr. Ricketts, does Mr. Vowels-Harper wish

20   to address the Court, as is his right?

21       (Mr. Ricketts conferring with defendant off the record.)

22               MR. RICKETTS:  Your Honor, he does not.

23               THE COURT:  That's fine.

24       I am going to take a brief break now.  I have carefully

25   considered all of the arguments I have heard.  I will carefully

1    consider again the testimony that was received here during the

2    course of this hearing, but I think that I would benefit from a

3    brief break to collect my thoughts and organize my thinking

4    before I finally conclude a decision on an appropriate sentence

5    in this case.  So we will be in a recess for about 15 minutes.

6    Thank you.

7         (Recess at 2:57 p.m. until 3:40 p.m.)

8         THE COURT:  Thank you.  We are back on the record.

9    There you are, Mr. Ricketts.

10        MR. RICKETTS:  Yes, Your Honor.

11        THE COURT:  I saw your seat empty and was concerned

12   that we were proceeding without you for a second.

13   I am now prepared to state the sentence and the reasons for

14   it unless there is anything else by way of argument or

15   discussion to bring to the Court's attention.

16        MR. RICKETTS:  Not on behalf of Mr. Vowels-Harper.

17        MR. MCKINESS:  No, Your Honor.  The forfeiture -- the

18   United States has filed a preliminary order of forfeiture, and

19   the victim has not requested restitution in this case, and I

20   think that's kind of it.

21        THE COURT:  I believe restitution is mandatory under

22   the provisions of the MVRA; is that correct?

23        MR. MCKINESS:  That is correct, Your Honor.

24        THE COURT:  And does the Government have a

25   recommendation as to how the Court is to discharge its

1   obligations with respect to the MVRA?

2           MR. MCKINESS:  Well, as I stated, the victim has not

3   requested restitution, but there is a mandatory $3,000

4   restitution floor in these types of cases, so --

5           THE COURT:  That was my inclination, Mr. Ricketts.

6   Mr. McKiness is simply to order the $3,000 restitution ordered

7   by the statute.

8           MR. RICKETTS:  I understand, Your Honor.

9           THE COURT:  Very well.  This is a difficult case and

10  that goes without saying, given the length of time the case was

11  litigated and given the numerous issues which have been

12  addressed throughout the pendency of the sentencing portion of

13  this case.

14      I do want to address one issue at the outset raised by

15  Mr. Ricketts.  He pointed out the extensive family support that

16  Mr. Vowels-Harper has.  I want to acknowledge again the presence

17  of Mr. Vowels-Harper's family and also to acknowledge and agree

18  with Mr. Ricketts on an important point he made about victims of

19  crimes often including family members of the offender.  And

20  whether or not I consider family members victims is really

21  immaterial.

22      What I do know, what experience teaches is that family

23  members of offenders are often impacted in a very profound and

24  enduring way.  And for Mr. Vowels-Harper's family, his parents,

25  and other close relatives, you have been and will continue to be

1    profoundly impacted by this case.  And I simply want to

2    acknowledge that and acknowledge that your support for

3    Mr. Vowels-Harper today and in succeeding years is important.

4        I have carefully considered the arguments of counsel,

5    specifically with respect to the defense request for a downward

6    variance.  I conclude that a modest downward variance is

7    appropriate here, and that's based upon Mr. Vowels-Harper's

8    young age and documented immaturity at the time of the crimes of

9    conviction, and this is also consistent with the JSIN data

10    reported in the Presentence Investigation Report.  But I also

11    conclude that a variance to the degree requested by Mr. Ricketts

12    would unduly diminish the seriousness of the defendant's crimes.

13        Prominent throughout the defense arguments is the theme that

14    Mr. Vowels-Harper is immature and misunderstands social norms as

15    a result of his Autism Spectrum Disorder.  And, in fact,

16    Dr. Wagner so opined, but these ASD deficits do not explain or

17    excuse the criminal behavior at issue here.  While Dr. Wagner's

18    report and testimony established that Mr. Vowels-Harper has ASD

19    and is immature for his age, his opinions do not show that

20    Mr. Vowels-Harper did not understand the consequences of his

21    actions.

22        While I credit Dr. Wagner's opinions and report in part, I

23    must observe that he failed properly to consider the objective

24    facts reported in paragraphs 10 through 18 of the PSR regarding

25    the communications at issue here when formulating his opinions.

1   One key example:  Dr. Wagner testified that Mr. Vowels-Harper

2   thought the victim was 16 or 17, but paragraph 9 reports that

3   she told him she was 13 when, in fact, she was 12; and

4   Vowels-Harper referred to her as 13 elsewhere in their chats,

5   including the chat reported in paragraph 14 of the PSR.

6        Mr. Vowels-Harper knew what he was doing was wrong.  He

7   expresses regret over the standard age of 18 in these chats.

8   And the PSR shows that Mr. Vowels-Harper is, to use

9   Mr. Ricketts' word, the "initiator" based upon any fair and

10  objective review of those chats in paragraphs 10 through 18.

11       I need also to address just briefly now the arguments made

12  which suggest that Mr. Vowels-Harper's ASD sets him apart in a

13  wholly unique way from other defendants similarly situated.  I

14  do not agree with the extent of this argument.  This suggestion

15  fails to account for those defendants routinely before this

16  Court and other courts that for different but equally compelling

17  reasons receive downward variances based upon their history and

18  characteristics, defendants who have suffered from abuse,

19  neglect, and trauma, or those with any number of diagnosed

20  mental health conditions that may contribute to the reasonable

21  conclusion that their decision-making capacity is compromised

22  and that that should be taken into account.  Understood in that

23  context, Mr. Vowels-Harper's ASD is not altogether unique and

24  dissimilar from others convicted of serious crimes such as those

25  at issue here.

1    I have previously indicated that I have carefully reviewed

2    the sentencing memoranda.  I have carefully considered the

3    arguments of counsel and the testimony presented.  I have

4    considered the guidelines and their recommendations, and I have

5    considered the factors set out by Congress in 18 U.S.C.

6    Section 3553(a).  I will now impose the following sentence:

7    It is the judgment of the Court that the defendant, Jonathon

8    Chase Vowels-Harper, is committed to the custody of the Bureau

9    of Prisons for a term of 226 months as to each of Counts 4 and 5

10   and 120 months as to Count 6, which shall be served concurrently

11   for a total term of 226 months' imprisonment.

12   Upon release, Mr. Vowels-Harper shall be placed on

13   supervised release for a term of 25 years as to each of

14   Counts 4, 5, and 6 in the Indictment, which shall be served

15   concurrently for a total of 25 years.

16   While on supervised release, the defendant shall abide by

17   the standard conditions of supervision adopted by the this

18   Court, as well as the special conditions detailed in Part G of

19   the PSR.  These include sex offender registration, sex offense

20   treatment, polygraph examination, search, third party

21   disclosure, financial disclosure, no contact with minors,

22   prohibition of illicit material, computer and internet access

23   monitoring, employment restrictions, and as appropriate mental

24   health treatment.  The U.S. Probation Office will answer any

25   questions Mr. Vowels-Harper may have regarding the requirements

1    of these conditions.

2        Mr. Vowels-Harper is required to pay a special penalty

3    assessment fee of $100 as to each count of conviction for a

4    total here of $300.  It is further ordered here, consistent with

5    the requirement of the Mandatory Victims Restitution Act, that

6    Mr. Vowels-Harper pay restitution in the amount of $3,000.

7        I am going to find that he is incapable of paying the $5,000

8    special assessment per the Justice for Victims of Trafficking

9    Act of 2015 and, therefore, that requirement is waived, along

10    with imposition of a fine and the associated costs, again,

11    because of Mr. Vowels-Harper's inability to pay.

12        I have carefully considered the history and characteristics

13    of Mr. Vowels-Harper.  As has been discussed, he has been

14    diagnosed with Autism Spectrum Disorder.  I have carefully

15    considered the submissions, testimony, and opinions submitted in

16    support of that diagnosis and the implications of it with

17    respect to an appropriate sentence.

18        I conclude that for the reasons I previously stated, a

19    modest downward variance is appropriate.  I have also considered

20    the nature and circumstances of the offenses of conviction here.

21    This case involves the sexual abuse and victimization of a

22    12-year-old girl.  The defendant's admitted conduct was shocking

23    and grotesque.  As outlined at the outset of this hearing, the

24    guidelines here produce a total offense level of 39 against a

25    criminal history category score of I.  The guidelines,

1    therefore, recommend a sentence be in the range of 262 to

2    327 months with a fine range of 50,000 to 250,000 and a range of

3    five years to life of supervised release to follow.

4        I conclude that this modestly reduced sentence of 226 months

5    properly reflects the seriousness of the offenses of conviction.

6    It will promote respect for the law.  It will afford adequate

7    deterrence, and I conclude that the sentence is sufficient but

8    not greater than necessary to comply with the purposes set forth

9    in Section 3553(a)(2).  It satisfies the applicable statutory

10   provisions.  And in sum, it represents just punishment under the

11   facts and circumstances of this case.

12       Are there any objections now, Mr. McKiness, Mr. Ricketts, to

13   the sentence I have just announced or the special conditions

14   which have not previously been made?

15           MR. MCKINESS:  The United States only objects to a

16   below guideline sentence.

17           MR. RICKETTS:  Nothing in addition to what -- to the

18   objections already announced.

19           THE COURT:  Thank you.

20       Let's now discuss Mr. Vowels-Harper's appeal rights.

21   Mr. Vowels-Harper, you have the right to appeal your conviction

22   if you assert some defect not waived by your guilty plea; and

23   you have the right to appeal the sentence that I just imposed if

24   you believe it was illegally or incorrectly imposed.

25       To appeal, you must first file a notice of appeal.  That

1   must be done within 14 days of the entry of judgment.  If you

2   need the assistance of the clerk's office in filing that notice,

3   they will upon request assist you.  If you cannot afford the

4   filing fee, you may ask that it be waived.  And if you cannot

5   afford counsel on appeal, you may ask that counsel be appointed

6   to represent you free of charge.  Do you understand your appeal

7   rights I've outlined for you?

8           THE DEFENDANT:  Yes.

9           THE COURT:  Anything further, Mr. Ricketts, with

10  respect to Mr. Vowels-Harper's Rule 32 rights that we need to

11  cover?

12          MR. RICKETTS:  No, sir.

13          THE COURT:  And do we have anything else that needs to

14  come to the Court's attention at this point?

15          MR. MCKINESS:  No, sir.

16          MR. RICKETTS:  No, Your Honor.

17          THE COURT:  Thank you.  We'll be adjourned.

18     (Proceedings concluded at 3:53 p.m.)

19

20

21

22

23

24

25

```
 1                        C E R T I F I C A T E

 2        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

 3    THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

 4


 5
            _____s/Dena Legg_____          _____
 6    Certified Court Reporter No. 20042A157     Date
      Official Court Reporter
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                   INDEX

2      DEFENSE WITNESSES:

3      MONIKA LYNN VOWELS-WOODEN
            Direct Examination By Mr. Ricketts              5
4
       CHRIS HARPER
5           Direct Examination By Mr. Ricketts             22

6      DENNIS WAGNER, PhD
            Direct Examination By Mr. Ricketts             37
7           Cross-Examination By Mr. McKiness              80
            Redirect Examination By Mr. Ricketts           97
8

9                                  EXHIBITS

10
       GOVERNMENT:
11     No exhibits

12

       DEFENDANT:
13     1 - report of Dr. Wagner (sealed)                   80

14

15

16

17

18

19

20

21

22

23

24

25